UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__12/17/2014__

-------------------------------------------------------X
TERAS INTERNATIONAL CORP.,                    :
                                    Plaintiff,:
                                              :
            -against-                         :        13-CV-6788 (VEC)
                                              :
ROGER GIMBEL, ALLAN FELDMAN,                  :        OPINION & ORDER
STEVEN BROOKNER, MARK                         :
KASTENBAUM, NORMAN ABRAMSON, and :
WORLDWIDE DREAMS LLC,                         :
                                  Defendants.:
-------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

        Teras International Corp., as assignee for Yick Bo Trading Limited, brings suit on a

variety of theories against Yick Bo's former sole shareholder, Worldwide Dreams LLC, and five

individuals who were officers and directors of Yick Bo or Worldwide Dreams.  Defendants

move to dismiss the complaint in its entirety, and Plaintiff moves for summary judgment as to its

third cause of action.  Because Yick Bo would lack standing to assert the first cause of action, so

too does Teras; Count One is therefore DISMISSED and the case is DISMISSED as against

Steven Brookner, Mark Kastenbaum, and Norman Abramson.  Defendants' motion is DENIED

as to Counts Two and Three, Teras's motion to strike the Lewington Declaration is DENIED,

and Teras's motion for partial summary judgment is DENIED.

                              **BACKGROUND**

I.      **Facts[1]**

        This case is brought by Teras, the assignee of Yick Bo.  Yick Bo is now bankrupt, but

when it was operative it was wholly owned by Defendant Worldwide Dreams and run by the

---

[1]      All facts herein are as alleged in the First Amended Complaint.  *See, e.g., Building & Const. Trades
Council of Buffalo, N.Y. and Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144 (2d Cir. 2006).  Facts from

individual defendants, *inter alia*.  First Am. Compl. ("FAC") ¶¶ 1-2, 4, 16.  Teras alleges that the individual defendants established Worldwide Dreams in 1997 as a wholesaler of women's accessories to large retail stores in the United States.  *Id.* ¶¶ 2, 14.  From Worldwide Dreams' New York offices, the individual defendants established Yick Bo as a wholly-owned subsidiary to act as the parent company's purchasing agent in Hong Kong.  *Id.* ¶¶ 15-16.  According to the complaint, the individual defendants "made all of Yick Bo's corporate decisions from their New York offices."  *Id.* ¶¶ 17-18.

Pursuant to an agency agreement, *see* FAC Ex. A (the "Agency Agreement"), Yick Bo purchased merchandise from Chinese suppliers for Worldwide Dreams to sell in New York, FAC ¶ 18.  The Agency Agreement provided that Yick Bo would find merchandise, negotiate pricing, perform basic quality control duties, and arrange for delivery to Worldwide Dreams.  Agency Agreement § 2(a)-(h).  In return, Yick Bo would earn a seven percent commission on all merchandise and services.  *Id.* § 3.  Although suppliers would frequently submit invoices directly to Worldwide Dreams, Yick Bo would pay those invoices and then submit weekly invoices to Worldwide Dreams for reimbursement.  FAC ¶ 19.  Kastenbaum, Worldwide Dreams' Chief Operating Officer ("COO"), would authorize Abramson, Worldwide Dreams' Chief Financial Officer ("CFO"), to pay Yick Bo.

At some point in either 2007 or 2009, Worldwide Dreams stopped reimbursing Yick Bo for the purchases that Yick Bo had made on its account.  *See id.* ¶¶ 20, 63.  Rather than stop purchasing merchandise for Worldwide Dreams, Yick Bo continued to order merchandise, apparently building larger and larger payables to the Chinese merchants with which it was doing business.  Although the complaint is not a model of clarity, it alleges that Yick Bo was able to

_____

extrinsic materials produced in support of or in opposition to the Motion for Summary Judgment are discussed *infra* but were not considered in ruling on the Motion to Dismiss.

continue to buy on credit because it prepared financial statements that falsely represented that its accounts receivable from Worldwide Dreams would be paid "in the normal course of business." *Id.* ¶ 22-1.  By falsely representing the credit situation between Yick Bo and Worldwide Dreams, "Yick Bo [was able] to continue purchasing on credit from its Chinese suppliers, which in turn [] allow[ed] Worldwide Dreams to continue selling the merchandise to customers in the U.S." *Id.* ¶ 22-2.

The complaint alleges that false financial statements were sent to Reddy Chu, Yick Bo's CFO and Director, and to Mazars CPA Ltd., Yick Bo's Hong Kong auditor.  *Id.* ¶¶ 24-25.[2] Similarly fraudulent financial statements were issued regarding the 2008, 2009, and 2010 fiscal years.  *Id.* ¶¶ 24, 32, 36.  Each one of these fraudulent financial statements allegedly perpetuated Yick Bo's existence, leaving it "another day older and deeper in debt."  Tennessee Ernie Ford, *Sixteen Tons* (Capitol Star Line 1955); *see* FAC ¶¶ 31, 35, 38-40.

By October 2011, Yick Bo's extension of credit to Worldwide Dreams caught up to it – although Worldwide Dreams owed Yick Bo more than Yick Bo owed its creditors, the individual defendants put Yick Bo into liquidation.  *Id.* ¶ 42.  Concerned that they would be unable to collect their receivables, the vendors who had been supplying Yick Bo with merchandise on credit demanded payment.  *Id.* ¶ 43.  Pursuant to an agreement among all of the individual defendants, and despite the fact that Yick Bo was in liquidation, Brookner promised Yick Bo's suppliers to resume paying amounts due,[3] thereby "fraudulently inducing [the Chinese venders] to continue producing and shipping orders to both companies based upon goodwill developed

---

[2]       The complaint does not allege that the false financial statements were shown to the Chinese suppliers.

[3]       The complaint does not specify whether Brookner promised that Yick Bo or Worldwide Dreams would pay the debt.  FAC ¶ 44.

over several years." *Id.* ¶ 44.  By the time Yick Bo ceased doing business in 2011, its suppliers were due nearly $9 million.  *Id.* ¶¶ 45-46.

The suppliers initiated a number of actions in New York state court.  *Id.* ¶ 48.  Some suppliers sued Worldwide Dreams directly, asserting "that Yick Bo was Worldwide Dreams' agent."  *Id.*  Kastenbaum, in an effort to protect the allegedly still-solvent parent corporation, submitted sworn affidavits that falsely depicted the relationship between Yick Bo and its sole shareholder.  *Id.* ¶¶ 49-51.  Ultimately Kastenbaum (on the agreement of all individual defendants) submitted four such fraudulent affidavits between November 2011 and January 2012.  *Id.* ¶ 51.

## II.     Procedural History

The unusual procedural history of this case merits a separate discussion.  Teras filed its initial complaint in September 2013.  Defendants moved to dismiss for failure to state a claim in February 2014, and the case was transferred to the undersigned shortly thereafter.  In March, over Defendants' objection, the Court issued an order permitting Teras to amend its complaint in response to the then-pending Motion to Dismiss or lose the opportunity to amend altogether. Dkt. 35, 36.  Teras indicated that it did not intend to file an amended complaint.  Dkt. 37.  In April the Court held oral argument on the Motion to Dismiss.  Prior to argument, the Court issued an order requiring the parties to be prepared to discuss at oral argument, *inter alia*, whether Yick Bo would have had standing to bring the complaint, what injury Yick Bo suffered that was distinct from the injury to its creditors, and whether there was precedent for holding that an entity was defrauded when its directors, officers, and sole shareholder were all aware of the misrepresented facts.  Dkt. 47.

At oral argument, the Court continued a stay of discovery as to Counts One and Two but permitted discovery to proceed as to Count Three.  Dkt. 50.  After a prolonged oral argument, the

Court required Teras to brief, *inter alia*, the harm "that Yick Bo suffered as a result of the conduct described in the first two claims in the Complaint" and the applicability of the adverse interest exception to the imputation of knowledge. *Id.*

After oral argument, Teras moved to amend its complaint. Dkt. 53. Over Defendants' objection, the Court granted leave to amend. Dkt. 64. The Amended Complaint alleges a civil RICO claim against all individual defendants (Count One); breach of fiduciary duty against Gimbel and Feldman (Count Two); and a claim for money due and owing against Worldwide Dreams (Count Three).

Defendants moved to dismiss Plaintiff's amended complaint for failure to state a claim and lack of standing, now relying on the questions of *Wagoner* standing and the doctrine of *in pari delicto* that the Court had raised during oral argument. Dkt. 66, 67. Five days after the Motion to Dismiss was fully briefed Teras moved for summary judgment as to Count Three. In opposition to that motion, Defendants submitted a Declaration from Robert Lewington, a Hong Kong solicitor and consultant on Hong Kong law who is familiar with the events surrounding Yick Bo's liquidation. Dkt. 85. Plaintiff moved to strike the Lewington Declaration; the Court therefore addresses each of these three motions in turn.

## DISCUSSION

### I. Motion to Dismiss

#### A. Overview

This case is mired in the thorny intersection of three tangled jurisprudential vines – constitutional standing, the so-called "*Wagoner* rule" from *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991),[4] and the doctrine of *in pari delicto*. Although the

---

[4] The *Wagoner* rule limits the ability of a bankruptcy trustee to recover from third parties on behalf of the estate's creditors.

three have been conflated at times, the *Wagoner* rule is "a prudential limitation on standing under federal law," while standing is a constitutional requirement and "*in pari delicto* is an affirmative defense, not a matter of standing." *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 459 n.3 (2010).

"To pursue a claim in federal court, a plaintiff must satisfy the requirements of constitutional standing, a principle established by the 'case or controversy' requirement of Article III of our Constitution." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liability Litig.*, 725 F.3d 65, 104 (2d Cir. 2013). "Litigants have Article III standing if they 'have suffered an injury in fact' that is 'fairly traceable to the challenged action' and 'likely to be redressed by a favorable decision.'" *United States v. Technodyne LLC*, 753 F.3d 368, 380 (2d Cir. 2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)) (alterations omitted). "Article III standing 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'" *Liberty Mut. Ins. Co. v. Donegan*, 746 F.3d 497, 502 n.2 (2d Cir. 2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

The standing "'inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat'l Ass'n*, 747 F.3d 44, 48 (2d Cir. 2014) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 128-29 (2004)) (other quotation marks omitted). "The 'prudential standing rule normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves.'" *Rajamin v. Deutsche Bank Nat'l Trust Co.*, 757 F.3d 79, 86 (2d Cir. 2014) (quoting *Warth*, 422 U.S. at 509) (alteration omitted); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. ---, ---, 134 S. Ct. 1377, 1386 (2014); *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289-92 (2008).

Flowing from these prudential limitations is the *Wagoner* rule, which holds that "'[a] bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's

6

creditors, but may only assert claims held by the bankrupt corporation itself.'" *Bennett Funding Grp. v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Grp.)*, 336 F.3d 94, 99-100 (2d Cir. 2003) (quoting *Wagoner*, 994 F.2d at 118)); *see also Bernard L. Madoff Inv. Sec. LLC v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54, 58 (2d Cir. 2013) ("*BLMIS I*") (confirming that the *Wagoner* rule is "rooted" in "prudential limitations" on standing). The *Wagoner* rule applies even where "there is at least a theoretical possibility that some independent financial injury to the Debtors might be established." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1094 (2d Cir. 1995) ("*Hirsch II*"), *aff'g* 178 B.R. 40 (D. Conn. 1994) (Cabranes, C.J.) ("*Hirsch I*").

The *Wagoner* rule relies heavily on agency law and specifically "the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000). "Underlying the rule is the presumption that an agent has discharged his duty to disclose to his principal 'all the material facts coming to his knowledge with reference to the subject of his agency.'" *Center v. Hampton Affiliates*, 66 N.Y.2d 782, 784 (1985) (quoting *Henry v. Allen*, 151 N.Y. 1, 9 (1896)). As a result, the *Wagoner* rule admits of exceptions from state agency law, such as the "adverse interest exception." *See Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822, 827 (2d Cir. 1997). The adverse interest "exception provides that when an agent is engaged in a scheme to defraud his principal, either for his own benefit or that of a third person, the presumption that knowledge held by the agent was disclosed to the principal fails because he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose." *Center*, 66 N.Y.2d at 784. "'To come within the exception, the agent must have *totally abandoned* his principal's interests and be acting *entirely* for his own or another's purposes. It cannot be invoked merely because he has a conflict of interest or because he is not

acting primarily for his principal.'"  *Kirschner*, 15 N.Y.3d at 466 (quoting *Center*, 66 N.Y.2d at

784-85) (emphasis in *Kirschner*).  "So long as the corporate wrongdoer's fraudulent conduct

enables the business to survive – to attract investors and customers and raise funds for corporate

purposes – this test is not met," even if the corporation is ultimately harmed by the fraud in the

long run.  *Id.* at 468; *see also id.* at 466-67 ("reserv[ing] this most narrow of exceptions for those

cases – outright theft or looting or embezzlement – where the insider's misconduct benefits only

himself or a third party; *i.e.*, where the fraud is committed *against* a corporation rather than on its

behalf") (emphasis in original).

There is an exception to the "adverse interest exception" in the context of "cases in which

the principal is a corporation and the agent is its sole shareholder."  *In re Mediators,* 105 F.3d at

827; *BLMIS I*, 721 F.3d at 65 n.14.  This carve-out, described as the "sole actor" rule, "imputes

the agent's knowledge to the principal notwithstanding the agent's self-dealing because the party

that should have been informed was the agent itself albeit in its capacity as principal."  *Id.* (citing

Harold Gill Renschlein & William A. Gregory, *The Law of Agency and Partnership* § 64 (2d ed.

1990)).

Unlike Article III and prudential standing, *in pari delicto* is a common-law affirmative

defense "mandat[ing] that the courts will not intercede to resolve a dispute between two

wrongdoers."[5]  *Kirschner*, 15 N.Y.3d at 464.  The *in pari delicto* "doctrine is based on the policy

that 'courts should not lend their good offices to mediating disputes among wrongdoers' and

'denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality.'"

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 83 (2d Cir. 2013) (Wesley, J.,

---

[5]      Although it is an affirmative defense, "a court may 'apply the *in pari delicto* doctrine at the pleadings stage
where the outcome is plain on the face of the pleadings.'"  *Republic of Iraq v. ABB AG*, 768 F.3d 145, 162 (2d Cir.
2014) (quoting *BLMIS I*, 721 F.3d at 65) (alterations omitted); *see also Kirschner*, 15 N.Y.3d at 459 n.3 ("in pari
delicto may be resolved on the pleadings").

concurring) (quoting *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985)).

*In pari delicto* provides a defense to both state law actions and to civil RICO causes of action.

*Republic of Iraq v. ABB AG*, 768 F.3d 145, 163 (2d Cir. 2014).

The principles of imputation and its exceptions apply with equal force to the affirmative

defense of *in pari delicto*.  *Id.* at 465; *see also O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 83

(1994) (clarifying that state law governs the imputation of knowledge).  Thus, when the officer

or agent of a corporation engages in wrongdoing that would bar that officer or agent from suing

under the *in pari delicto* doctrine, courts conduct an imputation analysis to determine whether

the agent's wrongdoing should be imputed to the corporation (and therefore bar the corporation

from recovering).  *Id.* at 465-66.  The applications of the "adverse interest exception" and the

"sole actor rule" function identically in this context.

### B.    Standing

Because it goes to the Court's subject matter jurisdiction, courts' inquiry into "whether a

plaintiff has standing" "ordinarily precedes [their] analysis of the merits."  *Jennifer Matthew*

*Nursing and Rehab. Ctr. v. U.S. Dep't of Health and Human Servs.*, 607 F.3d 951, 955 (2d Cir.

2010) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) and *Bennett v.*

*Spear*, 520 U.S. 154, 162 (1997)).  "'The party invoking federal jurisdiction bears the burden of

establishing standing.'"  *Hedges v. Obama*, 724 F.3d 170, 188 (2d Cir. 2013) (quoting *Clapper v.*

*Amnesty Int'l USA*, 568 U.S. ---, ---, 133 S. Ct. 1138, 1146 (2013)).  "'Each element [of Article

III standing] must be supported in the same way as any other matter on which the plaintiff bears

the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive

stages of the litigation."  *Susan B. Anthony List v. Driehaus*, 573 U.S. ---, ---, 134 S. Ct. 2334,

2342 (2014) (quoting *Lujan*, 504 U.S. at 561) (alteration omitted).  At the pleadings stage, the

Plaintiff must plausibly allege that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Int'l Action Ctr. v. City of New York*, 587 F.3d 521, 529 (2d Cir. 2009) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)); *cf. Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146 (2d Cir. 2011) (*per curiam*).

To allege an injury-in-fact sufficient to confer Article III standing, a plaintiff must plead "'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Natural Res. Def. Council, Inc. v. U.S. Food and Drug Admin.*, 710 F.3d 71, 80 (2d Cir. 2013) (quoting *Lujan*, 504 U.S. at 560). This requirement "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List*, 573 U.S. at ---, 134 S. Ct. at 2341 (quoting *Warth*, 422 U.S. at 498). "Injury in fact is a low threshold," and "'the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing.'" *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006)).

"The traceability requirement for Article III standing means that the plaintiff must 'demonstrate a causal nexus between the defendant's conduct and the injury.'" *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (quoting *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992)). The traceability element does not require that a defendant's conduct directly harm a plaintiff. *Garelick v. Sullivan*, 987 F.2d 913, 919 (2d Cir. 1993). Nevertheless, defendants' actions must be in some way "aimed" at the plaintiff; privately benefitting from a fraud that damaged the plaintiff does not confer standing. *Bernard L. Madoff Inv. Sec. LLC v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 740 F.3d 81, 93 (2d Cir. 2014) ("*BLMIS II*"). Moreover, like

10

the "injury-in-fact" requirement, a claim that an injury flows from a defendant's conduct may not be entirely speculative.  *Amnesty Int'l USA*, 568 U.S. at ---, 133 S. Ct. at 1149.

The third element of Article III's standing inquiry, redressability, "is the 'non-speculative likelihood that the injury can be remedied by the requested relief.'"  *Coal. of Watershed Towns v. U.S. Envtl. Prot. Agency*, 552 F.3d 216, 218 (2d Cir. 2008) (*per curiam*) (quoting *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008)).  Article III's "redressability" requirement "often is very practical – if the injury is not caused by the challenged acts, an order directed to them will not redress it."  13A Charles Alan Wright et al., Federal Practice and Procedure § 3531.5 (3d ed. 2014) (citing *Arar v. Ashcroft*, 534 F.3d 157, 191-92 (2d Cir. 2008), *aff'd in relevant part by* 585 F.3d 559, 563 (2d Cir. 2009) (*en banc*)).  "A plaintiff need not demonstrate with certainty that [its] injury will be cured by a favorable decision, but [it] must at least make a showing that there is a 'substantial likelihood that the relief requested will redress the injury claimed.'"  *E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 450 (2d Cir. 2014) (quoting *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 75 n.20 (1978)).  "'Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court.'"  *Coal. of Watershed Towns*, 552 F.3d at 218 (quoting *Steel Co.*, 523 U.S. at 107).

In Count One, Plaintiff has failed to allege a specific injury to Yick Bo (in whose shoes Teras stands) distinct from the injury to its creditors.  Moreover, to the extent that Plaintiff has alleged an injury to Yick Bo, it has not shown that any such injury can be traced to the fraud perpetrated by the Defendants.  Accordingly, Plaintiff does not have standing to assert its civil RICO claim. Plaintiff does, however, allege harm to Yick Bo traceable to the conduct complained of in Counts Two and Three.  Because the nature of Yick Bo's injury is best understood in the context of these claims, the Court examines standing as to Counts Two and

Three before discussing why Yick Bo was not injured by the conduct complained of in Count One.

### 1. Teras, as Yick Bo's assignee, has standing as to Counts Two and Three[6]

In this case, one injury to Yick Bo stands above the fray as a concrete, particularized injury-in-fact.  Yick Bo purchased merchandise (apparently both in cash and on credit) and transmitted the merchandise to Worldwide Dreams; Worldwide Dreams neither paid Yick Bo for the cost of the merchandise nor paid its commissions.  FAC ¶¶ 18-19, 31, 35, 40, 42.  Plaintiff alleges that Worldwide Dreams owes Yick Bo for the amounts it paid suppliers, the amounts it owes to suppliers for goods purchased on Worldwide Dreams' behalf, and its commissions on all of these purchases.  *Id.* ¶¶ 73-75.  Until Worldwide Dreams pays what it owes to Yick Bo, Yick Bo has approximately $15 million less than it otherwise would; this constitutes a clear injury-in-fact.  The fact that Yick Bo, a debtor, might ultimately owe some or all of its recovery to its creditors is irrelevant to the standing inquiry.  *Wagoner*, 944 F.2d at 119; *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988).  To paraphrase the Court in *APCC Services*, if Teras prevails in this litigation, the Defendants would write a check to it for the amount they owe.  What does it matter what Teras does with the money?  *APCC Servs.*, 554 U.S. at 287.

Yick Bo's injury-in-fact is directly traceable to the conduct challenged in Count Three.  Yick Bo purchased merchandise for Worldwide Dreams pursuant to an agreement that Worldwide Dreams would reimburse it and pay its commission; Worldwide Dreams did not do so, resulting in damage to Yick Bo.  This damage would be redressed by requiring Worldwide Dreams to pay Yick Bo – or its estate – the money that it owes.  Plaintiff therefore has standing

---

[6]    Insofar as Yick Bo would have had standing to pursue any claim, Teras, as assignee of Yick Bo's claims, has standing.  *APCC Servs.*, 554 U.S. at 275 ("Assignees of a claim . . . have long been permitted bring suit."); *see also Bogdan v. JKV Real Estate Servs. (In re Bogdan)*, 414 F.3d 507, 511-12 (4th Cir. 2005).

to pursue its claim under Count Three of the Complaint, which simply demands that Worldwide

Dreams pay Yick Bo the money that it owes.

Count Two alleges that Gimbel and Feldman, as Directors of Yick Bo, breached their

fiduciary duties to Yick Bo.  FAC ¶¶ 69, 20.  Although Plaintiff describes their conduct as

"looting" and "dissipation of Yick Bo's assets," *id.*, it also alleges that Gimbel and Feldman

breached their duties by "failing to obtain payment of Worldwide Dreams'[] obligations to Yick

Bo," the precise harm identified as a cognizable injury-in-fact, *id.* ¶ 67.  *See also id.* ¶ 68 ("Their

breach of fiduciary duty . . . caused Yick Bo to lose its assets *without any compensation or*

*repayment from [Worldwide Dreams].*") (emphasis added).  Plaintiff alleges that Gimbel and

Feldman owed a fiduciary duty to Yick Bo which they breached when they failed to cause

Worldwide Dreams to pay Yick Bo amounts due – this is sufficient to confer standing for

Plaintiff's second cause of action.[7]

### 2.  Teras lacks standing as to Count One

Yick Bo's other asserted injuries are far murkier.  For example, Plaintiff seeks to

repackage the injury redressed by Count Three by recasting it as Yick Bo's assumption of debt.

*See, e.g.,* FAC ¶¶ 38-39 ("Yick Bo was once again damaged by . . . deepening its

insolvency/indebtedness of $2.45 million worth of purchases from Chinese suppliers in 2011.

Yick Bo incurred the debt while Worldwide Dreams once again received the merchandise to sell

in the U.S.").  Incurring a debt – or even running the risk of incurring a debt – constitutes a

sufficient injury to confer Article III standing.  *Denney*, 443 F.3d at 265.  But Yick Bo's debt to

the suppliers is not an injury-in-fact, it is business.  The injury came when Yick Bo's parent

---

[7]      Insofar as Plaintiff challenges other conduct in its second cause of action, this conduct is substantially similar to the conduct challenged in the first cause of action.  Plaintiff lacks standing to pursue Count Two for all purposes other than the assertion that Gimbel and Feldman should have secured payment from Worldwide Dreams.

corporation refused to pay the money that Yick Bo was due under the agreement.[8]  Put

differently, Plaintiff does not allege that the transactions in which the individual defendants

allegedly caused Yick Bo to engage were unfair, unprofitable, or somehow injurious to Yick Bo

– what made them problematic was Yick Bo's inability to collect from Worldwide Dreams,

which is, of course, its first (and sole) injury.

Plaintiff also alleges that the Defendants' efforts to conceal Yick Bo's insolvency

resulted in Yick Bo's demise.  FAC ¶ 21.  This confusing assertion is belied by other language in

the complaint, by which Plaintiff asserts that if the auditors or Reddy Chu had known Yick Bo's

true financial state, they would have closed Yick Bo.  *Id.* ¶¶ 27, 30.  Concealing the fact that

Worldwide Dreams did not intend to repay Yick Bo did not result in harm to Yick Bo, much less

in Yick Bo's demise; it merely prolonged the situation and permitted Yick Bo to engage in

business longer than it might otherwise have (which was not, in itself, harmful to Yick Bo).  *Id.*

¶ 30.

Assuming *arguendo* that Yick Bo has suffered an injury-in-fact apart from Worldwide

Dreams' failure to pay under the Agency Agreement, no such injury is traceable to the conduct

charged in Count One.  Count One charges that the individual defendants engaged in a civil

RICO conspiracy by submitting fraudulent financial statements to Chu (Yick Bo's CFO) and

Mazars (Yick Bo's auditor), *id.* ¶¶ 23-25, 32-40; by inducing Yick Bo's suppliers to continue to

provide merchandise on the promise that Yick Bo would pay, *id.* ¶¶ 43-47; and by submitting

false affidavits to New York state courts denying that Worldwide Dreams had an agency

relationship with Yick Bo, *id.* ¶¶ 49-52.  These activities prolonged the period of time during

---

[8]        Yick Bo's creditors might very well have a claim that Worldwide Dreams caused them to ship goods with
only worthless promises of repayment in exchange.  But Plaintiff repeatedly protests that it "is not seeking to
recover on behalf of [Yick Bo's] suppliers."  FAC ¶ 46; *see also* Pl. Mem. Opp. at 5 (Plaintiff "is not seeking to
collect sums due the creditors.  It is suing for deepening Yick Bo's insolvency and failing to pay Yick Bo
commissions due under its agency agreement with [Worldwide Dreams].");  *see Hirsch I*, 178 B.R. at 43.

which Yick Bo was able to acquire merchandise on credit.  As discussed above, this was only harmful to Yick Bo because Worldwide Dreams did not pay Yick Bo for the merchandise. Otherwise, the conduct alleged (fraud and lying, through Yick Bo's corporate form, to outsiders) had no negative impact on Yick Bo.

Plaintiff alleges that Yick Bo's injury is traceable to the fraud because the fraud enabled Yick Bo to continue to exist, and each day that it existed it accrued more debt.  But this theory, too, relies on the assumption that Yick Bo was injured by being able to purchase merchandise (on credit) and transmitting the merchandise to its parent corporation (also on credit).  It was not. What harmed Yick Bo was its sole shareholder's failure to pay Yick Bo the money it was due. This injury is not traceable to the frauds alleged in Count One and would not be redressed by remedying those frauds.  Plaintiff thus lacks standing to proceed on its first cause of action.

### C.    *In Pari Delicto*

Defendants move to dismiss Counts One and Two under the doctrine of *in pari delicto*,[9] pursuant to which "a plaintiff who has participated in wrongdoing equally with another person may not recover from that other person damages resulting from the wrongdoing."  *Republic of Iraq*, 768 F.3d at 160.  On its face this case is a perfect candidate for dismissal under *in pari delicto* – Yick Bo (and Yick Bo's assignee Teras) should not be able to collect for a fraud that it perpetrated on its creditors.  The fact that the challenged conduct was committed by Yick Bo's agents, rather than Yick Bo itself, is irrelevant – "the acts of agents[] and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals . . . even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud."  *Kirschner*, 15 N.Y.3d at 465.  "[A] corporation 'is represented by its officers

---

[9]       The Court assumes *arguendo* that Plaintiff has standing as to Count One for the purpose of this analysis.

and agents, and their fraud in the course of the corporate dealings is in law the fraud of the corporation.'" *Id.* (quoting *Cragie v. Hadley*, 99 N.Y. 131, 134 (1885)) (alteration omitted). Nevertheless, Plaintiff advances several arguments against application of *in pari delicto*.  None is persuasive as to the claims against Brookner, Kastenbaum, or Abramson.

### 1.   The adverse interest exception does not apply

First, Plaintiff tries to take advantage of the adverse interest exception to the rule that acts of an agent are imputed to the principal.  New York courts "reserve[] this most narrow of exceptions for those cases – outright theft or looting or embezzlement – where the insider's misconduct benefits only himself or a third party, *i.e.*, where the fraud is committed *against* a corporation rather than on its behalf." *Id.* at 466-67 (emphasis in original).  Insofar as Counts One and Two allege that the individual defendants perpetrated a fraud by misrepresenting Yick Bo's financial condition to its suppliers and therefore induced the suppliers to continue to deal with Yick Bo, the exception does not apply.  "So long as a corporate wrongdoer's fraudulent conduct enables the business to survive – to attract investors and customers and raise funds for corporate purposes – this test is not met." *Id.* at 468; *cf.* FAC ¶¶ 27, 30 (telling the truth instead of committing fraud "would have effectively shut down Yick Bo.").  Thus, Yick Bo is presumed to have made the fraudulent statements to its suppliers and cannot therefore sue for those statements.

Insofar as Count Two alleges that Gimbel and Feldman breached their fiduciary duty not by perpetuating Yick Bo's existence but rather by postponing Worldwide Dreams' paying Yick Bo amounts that it was due, this seems at first blush to be subject to the adverse interest exception.  After all, failing to collect on its debt from Worldwide Dreams neither benefitted Yick Bo nor prolonged its existence.  It harmed Yick Bo and led to its demise.  Defendants seek to avoid this result by relying on the "sole actor rule."  The sole actor rule provides that "the

adverse interest exception does not apply to cases in which the principal is a corporation and the agent its sole shareholder." *In re Mediators*, 105 F.3d at 827. "This rule imputes the agent's [Worldwide Dreams'] knowledge to the principal [Yick Bo] notwithstanding the agent's self-dealing because the party that should have been informed was the agent itself[,] albeit in its capacity as principal." *Id.* (citing *Munroe v. Harriman*, 85 F.2d 493, 495-97 (2d Cir. 1936)). Worldwide Dreams "was [Yick Bo's] sole shareholder and decision maker, and therefore whatever decisions [it] made were, by definition, authorized by, and made on behalf of, the corporation." *Id.* Because the sole actor rule applies, the adverse interest exception to the doctrine of *in pari delicto* does not apply.

### 2. *In pari delicto* applies to RICO and breach of fiduciary duty claims

Plaintiff next argues that the doctrine of *in pari delicto* does not apply to claims under the civil RICO statute or for breach of fiduciary duty. Subsequent to the filing of Plaintiff's brief, the Second Circuit confirmed that *in pari delicto* does apply to some civil RICO causes of action. *See Republic of Iraq*, 768 F.3d at 167-68. Moreover, as discussed below, New York does not preclude the defense of *in pari delicto* as asserted against claims for breach of fiduciary duty. *See, e.g., Gitlin v. Chirinkin*, 121 A.D.3d 939, 939-40 (2d Dep't 2014) (affirming dismissal of a lawsuit for breach of fiduciary duty based on *in pari delicto*).

### 3. *In pari delicto* bars claims against the non-director defendants

"[C]laims against insiders for their acts as corporate fiduciaries are not barred by *in pari delicto*," because "it would be absurd to allow a wrongdoing insider to rely on the imputation of his own conduct to the corporation as a defense." *Krys v. Sugrue (In re Refco Inc. Sec. Litig.)*, No. 07-MD-1902(JSR), 2010 WL 6549830, at *15 (S.D.N.Y. Dec. 6, 2010), *adopted in relevant part by* 797 F. Supp. 2d 372, 377 (S.D.N.Y. 2011). This principle has its limits – not "every breach of fiduciary [duty] claim escapes *in pari delicto*. . . . Such a broad rule would be

inconsistent with the rationale for imputation." *Id.* at 16.  But "*in pari delicto* 'does not apply to the actions of fiduciaries who are insiders in the sense that they either are on the board or in management, or in some other way control the corporation.'" *In re Optimal U.S. Litig.*, 813 F. Supp. 2d 383, 400 (S.D.N.Y. 2011) (quoting *Refco*, 2010 WL 6549830, at *16) (emphasis omitted); *see also In re Mediators*, 105 F.3d at 826-27 ("[A] bankruptcy trustee, suing on behalf of the debtor under New York law, may pursue an action for breach of fiduciary duty against the debtor's fiduciaries."); *Global Crossing Estate Representative v. Winnick*, No. 04-CV-2258(GEL), 2006 WL 2212776, at *15 (S.D.N.Y. Aug. 3, 2006).  In this case, Plaintiff has not alleged that Brookner, Kastenbaum, or Abramson "controlled" Yick Bo; there is, therefore, no basis to find that the *in pari delicto* doctrine does not apply to them.  Plaintiff does allege, however, that Gimbel and Feldman were "directors of Yick Bo."  FAC ¶ 20.  The *in pari delicto* doctrine, therefore, does not bar Count Two.[10]

### D.  Failure to State a Claim

#### 1.  Defendants' motion to dismiss Count Two is denied

Defendants move to dismiss Count Two, which alleges, under N.Y. Business Corporation Law § 217, that Gimbel and Feldman breached their fiduciary duty to Yick Bo.  FAC ¶¶ 60-71. Defendants argue that this cause of action "sounds in fraud" but is not pled with particularity under Rule 9(b) and, alternatively, that Gimbel and Feldman did not owe a duty to Yick Bo. Neither argument is persuasive.

The Court does not read Count Two as sounding in fraud.  Defendants rely on Plaintiff's use of the term "scheme," describing that word as "the lexicon of fraud."  *See* Def. Mem. at 22

---

[10]     For the same reasons, if the Plaintiff had standing to pursue Count One (which it does not), it would nonetheless be barred by *in pari delicto* as asserted against Brookner, Kastenbaum, or Abramson, but not against Gimbel and Feldman.

(citing FAC ¶ 65). But the "scheme" described in the complaint is not a fraud scheme vis-à-vis Yick Bo. The "scheme" was for Yick Bo to purchase goods that were sold by Worldwide Dreams to customers in the United States. "While those customers paid Worldwide Dreams, Worldwide Dreams did not pay Yick Bo and Yick Bo was left with the debt." FAC ¶ 65. Plaintiff also alleges that "[h]ad Gimbel and Feldman fulfilled their obligations to Yick Bo, by ensuring the repayment by Worldwide Dreams of its obligations, Yick Bo would not have become insolvent." *Id.* ¶ 68. The Court therefore understands Count Two to charge that the directors breached their fiduciary duty by not pursuing the unpaid Worldwide Dreams receivable. *See id.* ¶ 20 ("Gimbel and Feldman should have either demanded repayment or terminated the agency agreement.").[11] Such a breach does not "sound in fraud," and Rule 9(b) is therefore not applicable. *Lindsay v. Morgan Stanley (In re Morgan Stanley Info. Fund Sec. Litig.)*, 592 F.3d 347, 358 (2d Cir. 2010).

Defendants' second argument is more complicated. They claim that under New York law Gimbel and Feldman did not owe a duty to Yick Bo because Yick Bo was a wholly-owned subsidiary of Worldwide Dreams.[12] "[T]he general rule is that directors and officers of a wholly owned subsidiary . . . owe fiduciary duties only to the parent corporation, not to the subsidiary." *Deangelis v. Corzine (In re MF Global Holdings Ltd. Investment Litig.)*, 998 F. Supp. 2d 157, 180 n.15 (S.D.N.Y. 2014) (citing *Aviall, Inc. v. Ryder Sys., Inc.*, 913 F. Supp. 826, 832 (S.D.N.Y. 1996), *aff'd*, 110 F.3d 892 (2d Cir. 1997)); *see also RSL Commc'ns PLC ex rel. Jervis v. Bildirici*, No. 04-CV-5217(KMK), 2006 WL 2689869, at *7 (S.D.N.Y. Sept. 14, 2006) ("*RSL*

---

[11]     Defendants do not contest that failure to pursue an unpaid debt can constitute a breach of fiduciary duty; the Court therefore does not address the sufficiency of this allegation.

[12]     "[W]here the parties agree that New York law controls, this is sufficient to establish choice of law." *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 566 (2d Cir. 2011). The Court does not understand Plaintiff's citations to the Delaware corporations law in its opposition to the motion to dismiss to be a renouncement of its earlier invocations of New York law in the Amended Complaint. FAC ¶¶ 66, 69.

*I*").  This is because "directors' duties to act as 'guardians of the corporate welfare,' – including fiduciary duties of care and loyalty – operate to the benefit of the corporation's owner[], who stand[s] to gain from the firm's success and also bear[s] the risk of its potential financial failure." *RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184, 201 (S.D.N.Y. 2009) ("*RSL II*") (quoting *Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 568 (1984)) (internal citation omitted), *aff'd by summary order sub nom. RSL Commc'ns PLC ex rel. Jervis v. Fisher*, 412 F. App'x 337 (2d Cir. 2011).  But once a corporation is insolvent, corporate officers and directors owe a fiduciary duty to preserve corporate assets for the benefit of creditors.  *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 94 N.Y.2d 541, 549 (2000).  In such cases, benefits to the corporation inure in the first instance not to its owners but to its creditors.

Defendants' argument is that Yick Bo was either solvent, in which case Gimbel and Feldman owed a duty only to Worldwide Dreams, or insolvent, in which case their duty was to the creditors and cannot be enforced by Yick Bo.[13]  Defendants are half right.  If Yick Bo had remained solvent, the directors would have owed no duties to Yick Bo distinct from their duties to its sole owner, Worldwide Dreams.  Plaintiff has alleged, however, that Yick Bo was insolvent at all times relevant to this action.  *See* FAC ¶¶ 62-64 (listing Yick Bo's liabilities (in December 2010, $10.56 million) and its assets (in December 2010, $2,500, not including the Worldwide Dreams receivable)).

Once Yick Bo was insolvent, its interests and those of its parent company diverged, and the duties owed by Yick Bo's directors could no longer be discharged solely by protecting the parent's interests.  *See Credit Agricole*, 94 N.Y.2d at 500; Andrew D. Shaffer, *Corporate*

---

[13]   The parties briefly discuss the implications of Yick Bo's teetering on the brink of bankruptcy, in the "zone of insolvency," but in New York a director's fiduciary duties remain firmly with the owners "while the company is merely operating in the zone of insolvency."  *Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, No. 13-CV-55869(VEC), 2014 WL 6466994, at *18 (S.D.N.Y. Nov. 18, 2014) (citing *RSL II*, 649 F. Supp. 2d at 198).

*Fiduciary – Insolvent: The Fiduciary Relationship Your Corporate Law Professor (Should Have)
Warned You About*, 8 Am. Bankr. Inst. L. Rev. 479, 512-20 (Winter 2000).  Yick Bo, in
insolvency, had interests that were distinct from those of its parent; it can bring suit if its
directors failed to protect those interests.

Defendants argue that from the moment a corporate officer's duty shifts from the
shareholders to the creditors, the corporation itself can no longer sue for breach of the duty.  Def.
Mem. at 22.  They cite no authority in support of this proposition, and, in fact, insolvent
corporations (including closely-held corporations) can sue their officers and directors for breach
of fiduciary duty.  *See Pereira v. Farace*, 413 F.3d 330, 342 (2d Cir. 2005) ("breach of fiduciary
duty claims belong to the corporation [as opposed to the creditors]"); *In re Mediators,* 105 F.3d
at 826-27; *Magnesium Corp. of Am. v. Renco Grp., Inc. (In re Magnesium Corp. of Am.)*, 399
B.R. 722, 760 (S.D.N.Y. 2009) ("'Put simply, when a director of an insolvent corporation,
through a breach of fiduciary duty, injures the firm itself, *the claim against the director is still
one belonging to the corporation.*'") (quoting *Prod. Res. Grp. L.L.C. v. NCT Grp., Inc.*, 863 A.2d
772, 792 (Del. Ch. 2004)) (emphasis in *Magnesium Corp.*); *see also Perry H. Koplik & Sons,
Inc. v. Koplik (In re Perry H. Koplik & Sons, Inc.)*, 476 B.R. 746, 797-99 (S.D.N.Y. 2012)
(collecting cases), *adopted in part by* 499 B.R. 276 (S.D.N.Y. 2013), *aff'd by summary order,*
567 F. App'x 43 (2d Cir. 2014); *In re Ampal-American Israel Corp.*, 502 B.R. 361, 374
(S.D.N.Y. 2013).  The fact that some or all of Yick Bo's recovery would revert to its creditors
does not mean that the cause of action does not vest in Yick Bo or that Plaintiff's suit is
somehow "on behalf of the creditors," Def. Mem. at 22, instead of on behalf of Yick Bo.  *Cf.
Wagoner*, 944 F.2d at 118; *Magnesium Corp.*, 399 B.R. at 763 (New York law "supports
focusing on whether the injury was to creditors or to the estate, but does not support going
beyond that, so as to declare that claims for injury actually suffered by the estate are deemed to

be claims by creditors.") (emphasis omitted) (citing *Barnes v. Schatzkin*, 215 A.D. 10, 10-11 (1st Dep't 1925)).

Because Plaintiff has adequately alleged that Gimbel and Feldman had a fiduciary duty to Yick Bo that was distinct from their duty to Worldwide Dreams, because breach of this duty constitutes an injury to Yick Bo distinct from any injury to the creditors, and because Defendants do not otherwise challenge Plaintiff's assertion that they breached their duty, the motion to dismiss Count Two for failure to state a claim is denied.

**2.   Defendants' motion to dismiss Count Three is denied**

Defendants also move to dismiss Plaintiff's claim for reimbursement, alleging that Plaintiff's claim lacks particularity.  Specifically, Defendants appear to take issue with the fact that some of the damages sought are owed by Yick Bo to its suppliers.  But that does not mean that the money is not also owed by Worldwide Dreams to Yick Bo – if Yick Bo bought goods from a vendor pursuant to an agreement with Worldwide Dreams that Worldwide Dreams would reimburse it, and if the vendor sold the goods on credit and shipped the merchandise to Worldwide Dreams, then Worldwide Dreams would owe Yick Bo directly and Yick Bo would, in turn, owe all or part of those funds to the vendor.  That does not mean that, in suing to enforce its rights, Yick Bo is suing *on behalf of* the vendor.  The Court declines to dismiss Count Three on this ground.

Insofar as Defendants' motion to dismiss Count Three is based on the imprecision of the allegations – the complaint does not list, for example, the specific transactions in which Yick Bo allegedly earned but was not paid commissions or is due reimbursement – this is best cured by discovery or could be addressed by a motion for a more definite statement under Rule 12(e).  *See Boykin v. KeyCorp*, 521 F.3d 202, 216 n.12 (2d Cir. 2008) (Sotomayor, J.) ("[T]he Federal Rules

of Civil Procedure provide several additional checks on the pleading of facts.") (citing Fed. R. Civ. P. 11(b)(3) and 12(e)).  Defendants' motion to dismiss Count Three is denied.

## II.    Motion to Strike

Plaintiff moves to strike the Declaration of Robert Lewington (the "Declaration"), which was submitted with Defendants' opposition to Plaintiff's motion for summary judgment. "Because a decision on the motion to strike may affect the movant's ability to prevail on summary judgment, it is appropriate to consider the Motion to Strike prior to the Motion for Summary Judgment."  *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 213 (S.D.N.Y. 2007), *aff'd by summary order*, 354 F. App'x 496 (2d Cir. 2009) (internal quotation marks and alteration omitted).  Plaintiff makes three arguments in support of its motion to strike: (1) the Declaration is inadmissible hearsay and violates the best evidence rule, (2) the Declaration was submitted in bad faith, and (3) Defendants failed to disclose Lewington as a possible witness in their Rule 26(a) initial disclosures.  None of these arguments is persuasive.

Plaintiffs' first two arguments are plainly without merit.  The Declaration is not inadmissible hearsay because it is at least partially based on personal knowledge that Lewington gained during Yick Bo's liquidation as counsel for Worldwide Dreams International Limited (another wholly-owned subsidiary of Worldwide Dreams and Yick Bo's largest creditor).  *See* Lewington Decl. ¶¶ 2, 7-11.  The so-called "best evidence rule," Fed. R. Evid. 1002, is also inapposite.  The Declaration establishes the existence and the authenticity of the relevant documents that it attaches.  Moreover, to the extent that it discusses settlement documents, what the Court would require is "proof of the fact of [settlement] and not of the contents of a [settlement agreement]."  *United States v. Sliker*, 751 F.2d 477, 483 (2d Cir. 1984).  It would therefore be inappropriate to strike the Declaration; the Court can consider the portions of the

Declaration that are based on admissible evidence when considering Plaintiff's motion for summary judgment.

Plaintiff has also failed to show that Defendants acted in bad faith in submitting the Lewington Declaration.  Plaintiff's argument, fundamentally, is that Defendants waived their right to argue that Hong Kong law applies by waiting until their submission in opposition to summary judgment to advance that theory.  Pl. Mem. at 4-6.  But that does not evidence bad faith, and Plaintiff would have been better served by arguing waiver.  Moreover, even if Plaintiff had shown that Defendants' assertion of Hong Kong law were untimely or in bad faith, it is not clear why the remedy should be striking the Lewington Declaration in its entirety, particularly when Plaintiff contends that "Lewington is really an ordinary fact witness whose testimony relates to the amount of money [Worldwide Dreams] owes to Yick Bo."  Pl. Reply at 3.

Plaintiff also argues that the Court must strike the Declaration because Defendants failed to disclose Lewington in their Rule 26 disclosures.  In this argument, Plaintiff has a point – Defendants' explanations for their failure to include Lewington among the witnesses they disclosed are unpersuasive – but at this stage of the litigation other remedies are more appropriate.[14]

"'Before granting the extreme sanction of preclusion,' the Court 'should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses.'"  *Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC*, 280 F.R.D.

---

[14]     Defendants' protestations that the strictures of Rule 26 do not apply to Lewington because (a) Lewington is a foreign law expert subject only to the disclosure requirements of Rule 44.1 and (b) the sole purpose of Lewington's testimony is impeachment are unpersuasive.  The Declaration is not expert testimony at all. Defendants do not cite to it as a mechanism for understanding how to best understand the acknowledged facts but instead as a source of facts suggesting the existence of a dispute.  Moreover, the necessity of introducing this evidence – which Defendants aver speaks to whether Worldwide Dreams has discharged some or all of the debt for which it is being sued – was not contingent on what Plaintiff proffered during discovery or its case-in-chief.  *See, e.g.,* Lewington Decl. ¶ 16.  Thus, the Defendants should have disclosed Lewington in their initial Rule 26 disclosures.

147, 157 (S.D.N.Y. 2012) (adopting report and recommendation) (quoting *Outley v. New York*, 837 F.2d 587, 501 (2d Cir. 1988)) (alteration omitted).  In determining whether to strike evidence for a party's failure to comply with its discovery obligations, courts consider a number of factors, including: "'(1) [Defendants'] explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witness[]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.'"  *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (quoting *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997)) (alterations omitted).  A consideration of these factors weighs against precluding the Declaration.

First, there are reasonable explanations for Defendants' failure to include Lewington in their Rule 26 disclosures.  Given the piecemeal nature of discovery in this case, Defendants' failure to disclose does not appear to have been an attempt to avoid discovery obligations and therefore does not warrant the harsh sanction of preclusion.  Second, the Declaration is significant because it suggests the possibility of a genuine dispute of material fact in the determination of Plaintiff's reimbursement claim and the amount of damages.  Plaintiff is not prejudiced by the need to meet the new testimony because the Court will extend the period for discovery on this claim and will give Plaintiff an opportunity to renew its motion for summary judgment at the close of discovery.  Plaintiff is thus situated exactly as it would have been had Lewington been timely disclosed as a potential witness.  Because this disclosure was made long before the eve of trial – and indeed no trial date has yet been set – the Court can accommodate Plaintiff's need for additional time to investigate Lewington's testimony without granting a continuance.

Accordingly, Plaintiff's motion to strike the Lewington Declaration is denied, and the Court has considered the Declaration in ruling on Plaintiff's motion for summary judgment.

## III.   Motion for Summary Judgment

Finally, Plaintiff moves for summary judgment on Count Three, which alleges that Yick Bo is entitled to unpaid reimbursement and unpaid commissions pursuant to the Agency Agreement.  Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  "The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions" of the record "that demonstrate the absence of a genuine dispute regarding any material fact."  *Curtis v. Williams*, No. 11-CV-1186(JMF), 2014 WL 2619805, at *3 (S.D.N.Y. June 12, 2014).

Plaintiff's theory on summary judgment is simple – Worldwide Dreams agreed to reimburse Yick Bo for purchases and pay a commission, Yick Bo made purchases for Worldwide Dreams, and Yick Bo did not receive reimbursements or commissions.[15]  Plaintiff's theory, if true, would mean that Worldwide Dreams is liable to Yick Bo – but on a motion for summary judgment, unlike a motion to dismiss, the Court cannot rely on Teras's bald assertion

---

[15]     Plaintiff also argues that Defendants have conceded everything by filing their response to Plaintiff's Request for Admission late.  Defendants' response was three days late, and Plaintiff does not identify any prejudice. This delay was the product of "excusable neglect," Fed. R. Civ. P. 6(b)(1), but Defendants are reminded of their obligations to respond within the timeframes set by the federal rules.  In any event, under these circumstances, the Court will not treat Defendants' responses as a nullity simply because they were three days late.

that it can collect whatever Yick Bo could have collected.  Plaintiff asserts that Defendants have

not offered evidence that conclusively establishes that the assignment is invalid, but it is

Plaintiff's burden to show, beyond genuine dispute, that it *is* entitled to recover funds that

Worldwide Dreams owes to Yick Bo.  Teras, which has adduced nothing more than the bare

statement: "Yick Bo has assigned its rights in this case to Teras International Corp.," Yuen Decl.

1 ¶ 10, has not discharged its burden in the face of Worldwide Dreams' evidence suggesting that

the assignment is invalid, *see* Lewington Decl. ¶ 14.[16]

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and

DENIED IN PART.  The first cause of action in the complaint is DISMISSED and the case is

DISMISSED as against defendants Steven Brookner, Mark Kastenbaum, and Norman

Abramson.  Plaintiff's motions to strike and for partial summary judgment are DENIED.  The

Clerk of the Court is directed to terminate Dkt. 67, 74, and 90.


**SO ORDERED.**


**Date:  December 17, 2014**                                      **VALERIE CAPRONI**
       **New York, NY**                                            **United States District Judge**

---

[16]     The Court notes that there also appears to be a genuine dispute as to how much money Worldwide Dreams owes to Yick Bo.  Plaintiff can establish how much Worldwide Dreams owed at a date several years prior to this action and possibly that Worldwide Dreams has not paid Yick Bo directly since that date, but Defendants have produced some evidence suggesting that Worldwide Dreams has paid settlements to Yick Bo's suppliers, thereby reducing Yick Bo's debt.  Gordon Decl. Exs. B-E.  Defendants represent that these settlements resolved the suppliers' claims against Yick Bo; Teras avers (counterintuitively and without evidence) that the suppliers have the same claims against Yick Bo that they would have if they had not sued on them and settled their lawsuits.  The Court is unprepared to find that Teras is entitled to judgment as a matter of law on this showing.