UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__9/1/17____

-----------------------------------------------------------X

TERAS INTERNATIONAL CORP.,                    :
                                              :
                              Plaintiff,:
                                              :        13-CV-6788 (VEC)
           -against-                          :
                                              :        MEMORANDUM
ROGER GIMBEL, ALLAN FELDMAN, and              :        OPINION & ORDER
WORLDWIDE DREAMS LLC,                         :
                                              :
                              Defendants.:
----------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

   Teras International Corp., as assignee for Yick Bo Trading Limited ("Yick Bo"), is suing

Yick Bo's former sole shareholder, Worldwide Dreams LLC ("Worldwide Dreams"), for

reimbursement for merchandise purchased on behalf of Worldwide Dreams and for commissions

earned on those purchases, and is suing Roger Gimbel ("Gimbel") and Allan Feldman

("Feldman"), former officers and directors of both Yick Bo and Worldwide Dreams, for breach

of their fiduciary duty to Yick Bo.  Defendants move for summary judgment as to both claims.

For the following reasons, Defendants' motion is granted in part and denied in part as to both of

Plaintiff's claims.

# BACKGROUND[1]

## I.     Worldwide Dreams and Its Wholly Owned Subsidiaries, Yick Bo and Worldwide Dreams International

Worldwide Dreams was a wholesale accessories import business founded by Gimbel and Feldman, Pl. 56.1 Stmt. ¶¶ 5, 7; it is incorporated in Delaware and had its principal place of business in New York, *id.* ¶ 6.  In 2005, Yick Bo, a Hong Kong company, became a wholly owned subsidiary of Worldwide Dreams.  *Id.* ¶¶ 8, 20.  Yick Bo was a sourcing and purchasing agent for Worldwide Dreams and Worldwide Dreams' other wholly owned Hong Kong subsidiary, Worldwide Dreams International Limited ("WWDI").  *Id.* ¶ 9.  Yick Bo placed orders with Hong Kong factories on behalf of Worldwide Dreams and WWDI for accessories, including handbags, neckwear, cosmetic bags, wallets, and other small leather goods.  *Id.* ¶ 10.  Worldwide Dreams would resell these accessories to customers in the United States, such as Target and Walmart, whereas WWDI would resell these accessories to customers outside of the United States.  *Id.*  In addition to acting as a sourcing and purchasing agent for Worldwide Dreams and WWDI, Yick Bo traded on its own behalf with vendors outside the United States.  *Id.* ¶ 11.

Yick Bo was funded in part from the revenue generated by WWDI, and Yick Bo relied on both Worldwide Dreams and WWDI to pay its operational expenses, such as payroll and rent.  *Id.* ¶¶ 12, 72.  The amount that Yick Bo needed from Worldwide Dreams and WWDI to cover its

---

[1]     The Court cites to the parties' Rule 56.1 Statements as follows:  Defendants' Rule 56.1 Statement (Dkt. 201) is "Defs. 56.1 Stmt."; Plaintiff's Rule 56.1 Statement (Dkt. 211) is "Pl. 56.1 Stmt."; and Defendants' Response to Plaintiff's Statement of Additional Material Facts (Dkt. 214) is "Defs. Response 56.1 Stmt."

The Court cites to Plaintiff's Rule 56.1 Statement when Plaintiff does not dispute Defendants' asserted facts and to Defendants' Response 56.1 Statement when Defendants do not dispute Plaintiff's additional asserted facts.  At times, Plaintiff and Defendants mark a fact as disputed, but the explanation for the dispute shows that the fact is not, in reality, disputed.  Instead, Plaintiff and Defendants, for example, make legal arguments, dispute only part of the fact, or argue that the fact does not have certain implications.  In such instances, the Court does not consider the fact to be disputed or to be disputed in its entirety.

operational expenses varied weekly given Yick Bo's own income from trading activities with non-U.S. third party customers. *Id.* ¶¶ 72-73.

Gimbel and Feldman managed the operations of Worldwide Dreams, and they were Directors of both Yick Bo and WWDI. *Id.* ¶ 14. Norman Abramson ("Abramson") was the Chief Operating Officer of Worldwide Dreams, and he ran its day-to-day operations. *Id.* ¶ 15. Reddy Chu ("Chu") was a Director, Chief Financial Officer, and Corporate Secretary of Yick Bo, and he ran Yick Bo's daily operations. *Id.* ¶¶ 16-17. Yick Bo's Articles of Association provide that Directors may hold interests in companies with which Yick Bo contracts so long as such interests are disclosed.[2] *Id.* ¶¶ 20-21.

Yick Bo and Worldwide Dreams had various agency agreements, but the operative version for purposes of this litigation was from 2008 ("Agency Agreement"). *Id.* ¶ 25; Gordon Decl. Ex. 11 (Dkt. 202-11). Pursuant to the Agency Agreement, Yick Bo agreed to "place orders (if necessary) with manufacturers on behalf of [Worldwide Dreams]," and Worldwide Dreams agreed "to pay to [Yick Bo] a commission of 7% on factory price for all FOB Sales and stock/warehouse orders for the merchandise and services handled by [Yick Bo] on behalf of [Worldwide Dreams]."[3] Pl. 56.1 Stmt. ¶ 25; Gordon Decl. Ex. 11 ¶¶ 2(c), 3.

The purchase orders Yick Bo provided to the Hong Kong factories from which it purchased accessories on behalf of Worldwide Dreams identified Yick Bo as an agent acting for Worldwide Dreams as the disclosed principal. Pl. 56.1 Stmt. ¶ 27; *see, e.g.*, Gordon Decl. Ex. 12 (Dkt. 202-12). But, invoices prepared by the Hong Kong factories stated that the invoiced

---

[2] The parties dispute whether this provision is legally valid under Hong Kong law, *see infra*.

[3] Why Worldwide Dreams would enter into a formal contract with or agree to pay commissions to its own wholly owned subsidiary is a mystery. *Cf. Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) ("A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate activities are guided or determined not by two separate corporate consciousnesses, but one.").

amounts were "to be paid by Yick Bo Trading Ltd," although many of the invoices also stated "Sold To: Worldwide Dreams LLC." *See, e.g.*, Galin Decl. Ex. H (Dkt. 212-2). In affidavits submitted in the fall and winter of 2011 in lawsuits brought by various Hong Kong factories against Worldwide Dreams for payment of purchases made by Yick Bo on Worldwide Dreams' behalf, Worldwide Dreams' controller averred that Yick Bo had "assumed sole payment responsibility" for the goods at issue. *See* Galin Decl. Ex. L ¶ 1 (Dkt. 212-3).

In about 2008, Worldwide Dreams began to experience cash flow problems. Pl. 56.1 Stmt. ¶ 30. In about 2009, Gimbel and Feldman, who were getting on in age and keen to retire, began to consider selling Worldwide Dreams and its subsidiaries. *Id.* ¶ 31. After consultation with Chu, Abramson, and consultants, Gimbel and Feldman decided to sell Worldwide Dreams and its subsidiaries as an integrated wholesale accessory import business. *Id.* ¶ 33. Gimbel and Feldman believed that by selling Worldwide Dreams and its subsidiaries as an integrated going concern, Yick Bo would be able to pay its Hong Kong suppliers and Worldwide Dreams would be able to pay its secured creditors. *Id.* ¶ 34.

## II. The Factoring Agreements

Gimbel and Feldman believed that in order to best position Worldwide Dreams and its subsidiaries for sale, it was critical that Worldwide Dreams and its subsidiaries continue operations. Pl. 56.1 Stmt. ¶ 36. To continue operating, the company needed a credit line. *See id.* After its previous factor filed for bankruptcy, Gimbel and Feldman searched for a replacement factor. *Id.* ¶¶ 37-39. In May 2010, Worldwide Dreams received a proposal from Capital Business Credit LLC ("CBC") for a line of credit of up to $9.5 million, solely to facilitate the sale of Worldwide Dreams and its subsidiaries. *Id.* ¶¶ 40-41, 44. Gimbel and Feldman considered the interests of Yick Bo, WWDI, and Worldwide Dreams when deciding whether to accept CBC's proposed factoring agreement. *Id.* ¶ 47. Before the CBC factoring

agreement was executed, Abramson, Gimbel, and Feldman informed Chu of the terms of the agreement, and Chu participated in the due diligence process on behalf of Yick Bo. *Id.* ¶¶ 48, 50. On July 30, 2010, Worldwide Dreams executed a factoring agreement with CBC ("Factoring Agreement"). *Id.* ¶ 52.

Pursuant to the Factoring Agreement, CBC agreed to advance up to 85% of eligible account receivables and up to 50% of eligible inventory in exchange for a first and only security interest in essentially all of Worldwide Dreams' assets. *Id.* ¶¶ 42-43. The Factoring Agreement required payments on accounts receivable in which CBC held a perfected security interest to be made directly to CBC. *Id.* ¶ 52. Worldwide Dreams and its subsidiaries agreed not to dispose of any collateral, which included cash, except for: (1) the sale of inventory in the ordinary course of business, and (2) obsolete equipment. *Id.* ¶¶ 53-54; Gordon Decl. Ex. 19 ¶ 6.3(a) (Dkt. 202-19). Worldwide Dreams was required to give CBC control of its bank accounts, which were to be maintained in Hong Kong and were to hold all of Worldwide Dreams' cash; this allowed CBC to pay the Hong Kong factories directly. Pl. 56.1 Stmt. ¶ 56.

The Factoring Agreement defined an "Event of Default" to include "any attachment, injunction, execution or judgment in excess of $10,000" issued or filed against Worldwide Dreams or any "legal action or proceeding . . . which results in damages in excess of $100,000." Gordon Decl. Ex. 19 ¶ 13(a)(x),(xv). Upon an Event of Default, CBC could accelerate loan repayment and exercise its rights to possess its collateral. *Id.* ¶¶ 13(b), 20.10.

When Worldwide Dreams executed the Factoring Agreement, Gimbel, Feldman, and Chu agreed that Yick Bo would guarantee Worldwide Dreams' payment and performance of all obligations and liabilities under the Factoring Agreement, and Gimbel and Feldman agreed that WWDI would also provide a guarantee. Pl. 56.1 Stmt. ¶¶ 62-63. Chu prepared a certificate memorializing the resolution of Yick Bo's Directors to guarantee Worldwide Dreams' payment

obligations to CBC, and the certificate provided that the Directors had resolved that Yick Bo would "obtain benefits" from guaranteeing Worldwide Dreams' obligations under the Factoring Agreement and that the guarantee was "necessary and convenient to the conduct, promotion and attainment of the business of . . . [Yick Bo]." *Id.* ¶¶ 64-65. Gimbel, Feldman, and Chu believed that the Factoring Agreement was necessary and in the best interests of Yick Bo and its creditors. *Id.* ¶ 66.

Pursuant to the terms of the Factoring Agreement, from August 2010 through March 2011, CBC made payments directly to Yick Bo. *Id.* ¶ 67. CBC made five payments to Yick Bo in February and March 2011 that were designated to pay specific Hong Kong factory invoices. *Id.* ¶ 92. Chu oversaw Yick Bo's accounts payable, made requests to CBC for payment, prepared weekly account statements for amounts due to the Hong Kong factories, and set up the means by which CBC could make payments to either Yick Bo or to the Hong Kong factories directly. *Id.* ¶¶ 68, 70.

### III.    The Payoff Projections and the Failed LF USA Deal

From September 2010 through March 2011, Gimbel and Feldman directed Abramson to collaborate with Worldwide Dreams' and its subsidiaries' accountant, WeiserMazars LLP, to prepare schedules for payments to Yick Bo's suppliers from the proceeds of a hypothetical sale of Worldwide Dreams and its subsidiaries. Pl. 56.1 Stmt. ¶ 75. Abramson prepared these payout schedules, which showed how the proceeds from a sale would be distributed at different price thresholds. *Id.* ¶ 76. On September 28, 2010, Abramson sent WeiserMazars a payout schedule that contemplated a $2.9 million payment to the Hong Kong factory creditors if Worldwide Dreams and its subsidiaries sold for $9 million. *Id.* ¶ 77.

In approximately November or early December 2010, Worldwide Dreams and LF USA Inc. ("LF USA") began negotiating for LF USA to purchase Worldwide Dreams and its

subsidiaries; the draft term sheets provided that LF USA would pay Worldwide Dreams $6.5 million up front and an additional payment at a later date for inventory. *Id.* ¶ 78. In light of these proposed terms, on December 6, 2010, Abramson sent WeiserMazars a payout schedule showing $2.9 million to be paid to the Hong Kong factories if Worldwide Dreams and its subsidiaries were sold for $6.5 million plus a future payment of $5 million for inventory. *Id.* ¶ 79.

On December 22, 2010, Worldwide Dreams and LF USA entered in a non-binding term sheet. *Id.* ¶¶ 80, 83. Shortly thereafter, based on the execution of the term sheet, Abramson expressed optimism to Chu about being able to pay the Hong Kong factories. *Id.* ¶ 84. Counsel for LF USA and Worldwide Dreams proceeded to exchange draft asset purchase agreements, and between December 2010 and March 2011, Gimbel, Feldman, Chu, and Abramson oversaw due diligence and continued to negotiate the asset purchase agreement with LF USA. *Id.* ¶¶ 85-87.

On March 8, 2011, Abramson sent Worldwide Dreams' controller a payout schedule that forecasted that $3,355,000 would be paid to the Hong Kong suppliers given an anticipated $6.5 million payment from LF USA at closing plus $3,888,000 in inventory sales and $5,244,000 in account receivable proceeds, which would be used to pay CBC. *Id.* ¶ 88. At that time, $3,355,000 constituted nearly the entire debt owed to Yick Bo's third party Hong Kong creditors, including the Hong Kong factory suppliers. *Id.* ¶ 89. On March 25, 2011, in an email to Chu, Abramson expressed his belief, shared by Gimbel and Feldman, that "CBC will transfer money into your existing accounts to pay the factories." *Id.* ¶ 90. Throughout the negotiation of the acquisition, Gimbel and Feldman believed that the acquisition would yield sufficient proceeds to pay all debt owed to the Hong Kong factories. *Id.* ¶ 91.

In April 2011, the LF USA deal collapsed unexpectedly due to the departure of the person at LF USA who was primarily responsible for orchestrating the deal. *Id.* ¶ 94. After the

collapse of the LF USA deal, Gimbel, Feldman, and Abramson held out some hope that they could find another buyer, and Worldwide Dreams was in discussions with proposed purchasers as of April 2011. *Id.* ¶¶ 95-96. On April 28, 2011, in response to a request from Yick Bo's auditors for a plan to settle the amount Worldwide Dreams owed to Yick Bo, Worldwide Dreams' controller informed Chu that "[d]ue to our efforts to reorganize our company, at this point in time, I am not able to provide you with a payment schedule."[4] Gordon Decl. Ex. 48 (Dkt. 202-48).

## IV.    Unwinding Worldwide Dreams And Its Subsidiaries

After the LF USA deal collapsed, CBC insisted that Worldwide Dreams' and its subsidiaries' assets be sold to satisfy the debt owed to CBC, and it reduced its cash advances to a level that was not sustainable. Pl. 56.1 Stmt. ¶¶ 98-99. Gimbel and Feldman decided that they had no choice but to wind down Worldwide Dreams' operations and sell its assets piecemeal at prices substantially lower than originally anticipated. *Id.* ¶ 100. By May 19, 2011, Worldwide

---

[4]      Plaintiff contends that on May 30, 2011, Gimbel and Feldman signed Yick Bo's audited financial statement for calendar year ending December 31, 2010, and the accompanying representation letter to Yick Bo's Hong Kong auditors, confirming that Worldwide Dreams could and would pay Yick Bo in full. Pl. 56.1 Stmt. ¶¶ 60, 132 (citing Galin Decl. Exs. I, M (Dkts. 212-2, 212-3)). Neither the audited financial statement nor the representation letter support this assertion. *See* Galin Decl. Exs. I, M. The representation letter—which is undated—states that "adequate provision has, in the opinion of the directors, been made against all amounts owing which are known or may be expected to be irrecoverable." Galin Decl. Ex. M ¶ 18. (An undated representation letter for WWDI's audited financial statement for year ending December 31, 2010, includes an identical statement. Galin Decl. Ex. Q ¶ 16 (Dkt. 212-3).) But, Yick Bo's audited financial statement includes a clear disclaimer, stating:

> We have not been provided with sufficient evidence to satisfy ourselves whether the outstanding amount could be recovered in full. Furthermore, we have not been able to obtain from management an assessment to verify the viability of the holding company to provide continuous settlements to [Yick Bo] so as to support the appropriateness of the going concern assumption. . . . Because of the significance of the matter described . . . we do not express an opinion on the financial statements as to whether they give a true and fair view of the state of [Yick Bo's] affairs . . . .

Galin Decl. Ex. I, at 2-3. Moreover, aware that the Hong Kong auditor would issue a qualified opinion if it did not have a schedule of payments from Worldwide Dreams to Yick Bo, Abramson notified Yick Bo that Worldwide Dreams could not provide a payment schedule that would satisfy the auditors and approved the release of the qualified opinion. *See* Gordon Reply Decl. Ex. 72 (Dkt. 215-1). Accordingly, Plaintiff has not presented sufficient evidence to dispute the fact that by May 30, 2011, it appeared that Worldwide Dreams could not pay the debt it owed to Yick Bo.

Dreams was in the process of negotiating an asset purchase agreement with Accessory Exchange LLC. Galin Decl. Ex. N (Dkt. 212-3).

In June 2011, Worldwide Dreams sold its neckwear division to Accessory Street LLC for $940,000 and its handbag and small leather good divisions to Accessory Exchange LLC for $1.65 million, comprising a total of approximately $2.6 million. Pl. 56.1 Stmt. ¶ 103. Pursuant to the Factoring Agreement, the proceeds from the sales were placed under CBC's control, which paid itself first pursuant to its first priority lien. *Id.* ¶ 104. After CBC paid itself, Worldwide Dreams used the remaining proceeds to pay its California distribution center $800,000 because it had a priority lien on inventory that was sold in the asset purchase transaction. *Id.* ¶ 107 (*see* response); Gordon Decl. Ex. 4 Tr. 38:3-39:12 (Dkt. 202-4). Worldwide Dreams also used the proceeds to pay $284,000 owed in rent to its landlord, the Empire State Building. Pl. 56.1 Stmt. ¶ 107 (*see* response); Ismail Report ¶ 48(2) (Dkt. 208-1). The remaining proceeds were insufficient to pay the Hong Kong factories in full. Pl. 56.1 Stmt. ¶ 106. Gimbel and Feldman did not profit from the asset sales, and they lost the entirety of their capital contributions to Worldwide Dreams. *Id.* ¶ 107. In addition, throughout the time they managed Worldwide Dreams, Gimbel and Feldman had taken nominal annual salaries of $25,000 and took no distributions of profits or interest payments on their subordinated loans. *Id.* ¶ 108.

Chu retired from Yick Bo on May 31, 2011. *Id.* ¶ 109. Through the fall of 2011, Gimbel and Feldman continued to direct Worldwide Dreams' controller in the wind-down of Worldwide Dreams' operations. *Id.* ¶ 110.

## V.     Yick Bo's Liquidation

On October 26, 2011, Yick Bo's members resolved to voluntarily wind down the company. Pl. 56.1 Stmt. ¶ 112. That same day, a notification was filed with the Hong Kong

Companies Registry to convert the Members' Voluntary Liquidation into a Creditors' Voluntary Liquidation. *Id.* ¶ 113.

Yick Bo had been solvent until April 2011 when the LF USA deal collapsed. *Id.* ¶ 101. After Yick Bo became insolvent, Worldwide Dreams made four payments to Yick Bo totaling approximately $260,000. *Id.* ¶ 105. The list of creditor claims and proofs of debt in the liquidation proceeding show that 98% of the purchase orders reflecting outstanding debt owed by Yick Bo to third party suppliers ($2,233,485) were placed in or before March 2011, when Yick Bo was solvent. *Id.* ¶ 102.

At the time of the voluntary liquidation, the companies' books and records showed an intercompany payable from Worldwide Dreams to Yick Bo totaling $14.68 million[5] and an intercompany payable from Yick Bo to WWDI totaling $6.2 million, making WWDI Yick Bo's largest creditor. *Id.* ¶ 114. Yick Bo's creditors initially claimed a total of $3.8 million. *Id.* ¶ 115. The parties dispute whether that $3.8 million has been reduced to $2.5 million: Defendants claim that Worldwide Dreams settled claims on its and Yick Bo's behalf in February 2012 for approximately $1.3 million;[6] Plaintiff contends Worldwide Dreams did not have the legal authority to settle debts owed by Yick Bo when Yick Bo was in liquidation. *See id.* ¶¶ 115, 117-121. But Plaintiff admits that, according to the liquidators' own calculations, as of July 12, 2013, Yick Bo owed its third party creditors (other than WWDI) approximately $2.5 million. *Id.* ¶ 122.

---

[5]      Of this amount, $298,297.02 was owed for unpaid commissions. Defs. Response 56.1 Stmt. ¶ 135.

[6]      Specifically, Worldwide Dreams settled with one creditor for $987,161 and with another for $305,628, which together equals $1,292,789. Pl. 56.1 Stmt. ¶¶ 117, 120. Because Defendants assert that Worldwide Dreams settled those claims "entirely," the Court understands that Worldwide Dreams settled those claims for 100 cents on the dollar. *See id.*

## VI.    Procedural History

On May 24, 2013, the liquidators assigned their claims against Defendants to Plaintiff in consideration for 60% of the net recovery in this action, meaning Plaintiff could retain 40% of the net recovery.  Pl. 56.1 Stmt. ¶ 128; Gordon Decl. Ex. 63 ¶ 2.1 (Dkt. 202-63); *see also id.* Ex. 64 (Dkt. 202-64) (expanding scope of assignment to include claims against Gimbel and Feldman).  Plaintiff filed its Complaint in this action in September 2013, and the case was transferred to the Undersigned in March 2014.

In June 2014, while a motion to dismiss was pending, the Court granted Plaintiff's motion for leave to amend.  Dkt. 64.  Plaintiff's Amended Complaint alleged a civil RICO claim against all individual defendants (Count One), a breach of fiduciary duty claim against Gimbel and Feldman (Count Two), and a claim for reimbursement and commissions against Worldwide Dreams (Count Three).  Dkt. 66.  Defendants moved to dismiss the Amended Complaint in its entirety, and Plaintiff moved for summary judgment as to Count Three.  Dkts. 67, 74.  The Court granted Defendants' motion to dismiss Count One and dismissed three individual defendants from the case; the Court denied Plaintiff's motion for summary judgment as to Count Three. Dkt. 96.  The Court subsequently held that Hong Kong law would apply to Plaintiff's remaining claims, and thus the Court applies Hong Kong law in deciding summary judgment.[7]  Dkt. 157. On February 24, 2016, the Court ruled that Plaintiff was estopped from pursuing a duty of care

---

[7]        "The Federal Rules of Civil Procedure provide that '[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.'"  *In re Tyson*, 433 B.R. 68, 78 (S.D.N.Y. 2010) (quoting Fed. R. Civ. P. 44.1).  In support of their summary judgment motions, both parties have submitted expert reports regarding Hong Kong law, and both parties submitted Hong Kong case law.  Plaintiff's expert is David Donald, whose report and rebuttal report are available as Exhibits D and E, respectively, to the Galin Declaration (Dkts. 212-1, 212-2).  In addition, Plaintiff has submitted two declarations by Minju Kim regarding liquidation proceedings pursuant to Hong Kong law, which are available as Exhibits F and X to the Galin Declaration (Dkts. 212-2, 212-4).  Defendants' expert is Roxanne Ismail, whose report and rebuttal report are available as Exhibits 1 and 2 to the Ismail Declaration (Dkt. 208-1, 208-30).  In addition, Defendants have submitted an expert report regarding Hong Kong accounting standards; the expert is Mavis W.G. Tan, and his report is available as Exhibit 1 to the Tan Declaration (Dkt. 207-1).

claim in light of Plaintiff's previous representations to the Court that it was only pursuing a duty of loyalty claim (known under Hong Kong law as a fiduciary duty claim). Dkt. 175. Defendants then moved for summary judgment. Dkt. 200.

## DISCUSSION

### I.     Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (internal quotation marks omitted). Courts "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (*per curiam*) (quoting *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 79-80 (2d Cir. 2009)) (alteration omitted).

The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts," and "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir. 2005) (citations and internal quotation marks omitted). Rather, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (citation omitted). "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## II.        Breach of Fiduciary Duty Claim

The parties do not dispute that, as directors of Yick Bo, Gimbel and Feldman owed

fiduciary duties to Yick Bo.  Plaintiff claims that Gimbel and Feldman's failure to pursue the

receivable owed to Yick Bo by Worldwide Dreams was a breach of the fiduciary duties they

owed to Yick Bo.  Pl. Opp. 5.[8]  Gimbel and Feldman argue that they satisfied their fiduciary

duties at all times.  Defs. Mem. 3.

### A.  Duty to Act in the Company's Best Interests

Under Hong Kong law, the core fiduciary duty of a director is to act in the company's

bona fide best interests, or in other words, to promote the success of the company.  Ismail Report

¶ 74.  Defendants argue that this is a subjective test, while Plaintiff argues that it is objective

because Gimbel and Feldman had conflicts of interest.  Defs. Mem. 17; Pl. Opp. 14.  Regardless

of which test applies, as explained below, there is no question of fact that, with a single limited

exception, Gimbel and Feldman acted in Yick Bo's bona fide best interests.[9]

In the case of a solvent company, the interests of the company are considered to be those

of its shareholders as a group.[10]  Ismail Report ¶ 77.  When a company is insolvent or nearly

---

[8]        The Court cites to the parties' briefs as follows: Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment (Dkt. 209) is "Defs. Mem."; Plaintiff's Memorandum in Opposition (Dkt. 210) is "Pl. Opp."; and Defendants' Reply Memorandum (Dkt. 213) is "Defs. Reply."

[9]        Although it does not need to decide whether a subjective or objective test applies because both tests are satisfied, the Court notes that Plaintiff primarily relies on a decision from Hong Kong's lowest court, *David Chien v. Francis Cheung*, [2013] HKEC 896 (C.F.I.) (Galin Decl. Ex. FF, Dkt. 212-4), for the proposition that an objective test applies when directors have a conflict of interest.  Plaintiff's expert acknowledged during his deposition that he was not aware of another case that had followed *David Chien's* objective test.  Galin Decl. Ex. GG, Tr. 63:11-64:15 (Dkt. 212-4).

[10]        Plaintiff contends that Defendants' position is that directors owe a duty directly to the shareholders and not to the company itself, i.e., Gimbel and Feldman owed a duty only to Worldwide Dreams as shareholder and not to Yick Bo.  Pl. Opp. 6.  Plaintiff, however, manufactures this disagreement on the law; the parties in fact agree that directors owe a duty to act in a company's best interests and that the company's interests are those of its shareholders.  *See* Pl. Opp. 6; Defs. Reply 2.  In this case, Yick Bo happened to have a single shareholder—Worldwide Dreams.  To the extent Plaintiff is arguing that a director has a duty to the company that is wholly independent of his or her duty to act in the best interests of the shareholders as a group, the Court interprets this argument to be that directors must also act in the best interests of a company's creditors when the company is

insolvent, directors must not only consider the interests of the company's shareholders but also the company's creditors. *Id.* The parties do not dispute (at least for the purpose of summary judgment) that Yick Bo was solvent until April 2011. Defs. Mem. 16; Pl. Opp. 7 n.5. Accordingly, until April 2011, Yick Bo's interests were those of its sole shareholder, Worldwide Dreams, and after April 2011, Yick Bo's interests were those of its sole shareholder and its creditors. When a director owes fiduciary duties to multiple companies in a corporate group—as Gimbel and Feldman do because they are directors of Worldwide Dreams, the parent company, and Yick Bo and WWDI, wholly owned subsidiaries—he or she satisfies his or her fiduciary duties by considering the interests of each company separately and acting in the best interest of each company. Ismail Report ¶ 79; Donald Report ¶ IV(C)(10).

### 1. *Gimbel and Feldman Acted in Yick Bo's Best Interest Pre-April 2011*

Gimbel and Feldman acted in Yick Bo's and Yick Bo's creditors' best interests—both subjectively and objectively—when they decided not to pursue the receivable owed by Worldwide Dreams to Yick Bo and decided instead to try to sell Worldwide Dreams and its subsidiaries as a going concern. Worldwide Dreams, like many other companies, began experiencing financial difficulties in 2008 when the United States was in a deep recession. Pl.

---

insolvent. The sources on which Plaintiff relies state that directors can have a duty to a company's creditors and make no mention of a duty to other interests of the company that are independent of shareholders' and creditors' interests. *See* Donald Report ¶ IV(C)(9) ("The fiduciary duty runs to the company, not the shareholders. In a recent case in which a director declared a dividend that prevented the company from fulfilling its obligations *to creditors*, the director was found to have breached his fiduciary duty.") (emphasis added); *see Tradepower (Holdings) Ltd. v. Tradepower (Hong Kong) Ltd.* [2009] 12 HKCFAR 417, ¶¶ 20, 34, 120 (C.F.A.) (Dkt. 208-27) (the appeal concerned a company that was insolvent and in liquidation)). (The parties cite to a 2010 *Tradepower* opinion but attach as an exhibit this 2009 *Tradepower* opinion; it is clear from the parties' discussion that they intended to cite to the 2009 opinion.)

In addition, Plaintiff argues that under Hong Kong law, directors have a duty to guard corporate assets. Pl. Opp. 5, 7. As Defendants explain, however, *see* Defs. Reply 3 n.6, and as is clear from the cases cited by Plaintiff, *see Chintung Futures Ltd.*, [1994] 1 HKLR 95, 112 (H.C.) (discussing "safeguards duty") (Galin Decl. Ex. EE), *David Chien v. Francis Cheung*, [2013] HKEC 896, ¶ 112 (C.F.I.), the duty to guard corporate assets is part of a director's duty of care. The duty of care is outside the scope of Plaintiff's fiduciary claim, *see supra*.

56.1 Stmt. ¶ 30. Gimbel and Feldman consulted Chu—Yick Bo's third director—Abramson and others about selling Worldwide Dreams as an integrated wholesale accessory import business, and they believed that doing so would generate enough cash to enable Yick Bo to pay its Hong Kong suppliers and Worldwide Dreams to pay its secured creditors. *Id.* ¶¶ 33-34. Gimbel and Feldman believed that Worldwide Dreams and its subsidiaries would sell at a higher price if they were sold as an operating, integrated business, but the companies required a credit line in order to continue to operate while looking for a buyer. *Id.* ¶ 36. Gimbel and Feldman considered the individual interests of Worldwide Dreams, Yick Bo, and WWDI before entering into the Factoring Agreement, and they informed Chu of the Agreement's terms. *Id.* ¶¶ 47-48. Between August 2010 and March 2011, CBC released funds to Yick Bo on behalf of Worldwide Dreams so that Yick Bo could pay its Hong Kong suppliers. *Id.* ¶¶ 67, 92. Between December 2010 and March 2011, Worldwide Dreams and LF USA exchanged draft purchase agreements pursuant to which LF USA would acquire Worldwide Dreams and its subsidiaries for approximately $15.6 million. *Id.* ¶¶ 85-86, 93. Chu, along with Gimbel, Feldman, and Abramson, oversaw the due diligence and deal negotiations. *Id.* ¶¶ 86-87. In March 2011, before the LF USA deal cratered, Worldwide Dreams anticipated a payout to Yick Bo of $3.35 million, which would have covered almost the entire debt owed by Yick Bo to its Hong Kong suppliers. *Id.* ¶¶ 88-89, 91.

Plaintiff does not dispute any of those facts. Those decisions—to sell Worldwide Dreams and its subsidiaries as a going concern, to enter into the Factoring Agreement, and to pursue the sale of the companies to LF USA for approximately $15.6 million—were clearly all made in Yick Bo's best interests because, by maintaining Yick Bo's operations, they would maximize the funds that would become available to pay Yick Bo. Moreover, Gimbel and Feldman considered the interests of Yick Bo separately from the other companies, as demonstrated by the fact that they ensured that Chu, Yick Bo's third director, was involved in all of these decisions and in

their execution. Plaintiff's only arguments in support of its claim that Gimbel and Feldman breached their fiduciary duty to Yick Bo by not pursuing the Worldwide Dreams receivable before the LF USA deal collapsed in April 2011 are: (1) Defendants have not explained why it was necessary not to pursue the receivable in order to sell Worldwide Dreams and its subsidiaries to LF USA, and (2) Plaintiff believes that Gimbel and Feldman never intended to pay Yick Bo, even when they were negotiating the LF USA deal. *See* Pl. Opp. 11, 13.

As to the first argument, Plaintiff has presented no evidence to suggest that Gimbel and Feldman were not acting in Yick Bo's best interests when they sought to sell Worldwide Dreams and its subsidiaries to LF USA. To defeat summary judgment, Plaintiff must present evidence showing that it would have been in Yick Bo's best interest for its directors to pursue the receivable owed by Worldwide Dreams during the time the company was negotiating with LF USA. Plaintiff cannot satisfy its burden merely by complaining that Defendants have not explained why pursuing the receivable would not have been in Yick Bo's best interest.

Moreover, Defendants have presented evidence showing that it was likely necessary *not* to pursue the receivable in order to sell Worldwide Dreams and its subsidiaries as an integrated business. Worldwide Dreams' unaudited balance sheets for December 31, 2010 and March 31, 2011 show $803,448 and $558,697 in cash, respectively.[11] *See* Gordon Decl. Exs. 22, 23 (Dkts. 202-22, 202-23). Thus, Worldwide Dreams did not have the funds to pay down the receivable,

---

[11]     Plaintiff claims that these are consolidated balance sheets for Worldwide Dreams and its subsidiaries, Pl. Opp. 17 n.12; Defendants do not address this point, and the Court cannot tell from the balance sheets alone whether they are consolidated. Regardless, if they are consolidated, the financial situation of the companies appears to be even more dire given that the cash position would then reflect the total cash available for Worldwide Dreams and its subsidiaries.

Plaintiff also argues that the unaudited balance sheets are not probative for summary judgment. Pl. Opp. 17 (citing *Dauphin v. Crownbrook ACC LLC*, No. 12-CV-2100 (ARR) (SMG), 2013 WL 1498363, at *8 (E.D.N.Y. Apr. 11, 2013)). In *Dauphin*, however, there was testimony that the financial documents mischaracterized at least one line item, which further called into question the accuracy of the unaudited financial statements. 2013 WL 1498363, at *8. Here, Plaintiff has presented no evidence to dispute the accuracy of the balance sheets.

even if Yick Bo had pursued it. Furthermore, an attempt to "pursue" the receivable may have resulted in a default under the Factoring Agreement.[12] Any attachment or judgment in excess of $10,000 or legal proceeding resulting in damages in excess of $100,000 would have been an Event of Default under the Factoring Agreement, and, upon an Event of Default, CBC could have accelerated the loan repayment and exercised its right to possess collateral. Gordon Decl. Ex. 19 ¶¶ 13(b), 20.10. Because Worldwide Dreams did not have the cash to pay Yick Bo's receivable, by pursuing the receivable, Yick Bo would have run the risk of triggering an Event of Default and a seizure of Worldwide Dreams' assets by CBC, at which point the plan to sell Worldwide Dreams and its subsidiaries as an ongoing, integrated business would have fallen apart.[13] Running that risk was obviously not in Yick Bo's best interest given Worldwide Dreams had found a buyer that was willing to purchase the companies at a price that would have enabled Worldwide Dreams to pay (at least most of) the receivable owed to Yick Bo.

As to the second argument, namely that Gimbel and Feldman never intended to pay Yick Bo when negotiating the LF USA deal, Plaintiff fails to present any evidence to support that assertion. Plaintiff cites to Abramson's deposition, *see* Pl. Opp. 11 (citing Gordon Decl. Ex. 4 Tr. 107-108), but Abramson merely testified that there was no agreement to pay Yick Bo from the proceeds of the LF USA sale and that Worldwide Dreams' directors and Abramson, aware that Yick Bo was unhappy about not being paid because it was receiving pressure from its

---

[12] Plaintiff does not actually explain what it means when it argues Yick Bo should have "pursued" its parent for payment. Because Worldwide Dreams did not have the cash on hand to satisfy the intercompany receivable, presumably Plaintiff is arguing that Yick Bo should have sued its parent for payment. That scenario seems silly, particularly because at the same time that Worldwide Dreams owed funds to Yick Bo, Yick Bo owed funds to WWDI, Worldwide Dreams' other subsidiary.

[13] Yick Bo claims that Worldwide Dreams had an affirmative obligation to pay Yick Bo pursuant to sections 8.1(m) and (o) of the CBC factoring agreement. Pl. Opp. 14. Those provisions, however, do not provide as much; instead, they only require Worldwide Dreams and Yick Bo generally to comply with the law and perform their "contractual obligations" without any specific reference to the payment of intercompany receivables. Gordon Decl. Ex. 19 ¶¶ 8.1(m), (o).

suppliers, were trying to maximize the sale price so that Worldwide Dreams could pay Yick Bo. Gordon Decl. Ex. 4 Tr. 107:8-108:13. This testimony supports Gimbel and Feldman's argument that they were acting in Yick Bo's best interest by seeking to negotiate a deal that would generate enough cash so that Yick Bo could be paid. This interpretation of the testimony is consistent with the payout schedules that were prepared by Abramson at Gimbel and Feldman's direction and sent to Chu. Those schedules consistently show Yick Bo being paid from the sale proceeds. Pl. 56.1 Stmt. ¶¶ 75-77, 79, 81, 88.

Accordingly, there is no material dispute that Gimbel and Feldman acted in Yick Bo's and Yick Bo's creditors' best interests when negotiating the sale of Worldwide Dreams and its subsidiaries as an ongoing, integrated business.

> 2. *Gimbel and Feldman Acted in Yick Bo's Best Interest Post April 2011, With One Exception*

After the LF USA deal fell apart in April 2011, Gimbel and Feldman, with one exception, indisputably continued to act in Yick Bo's and Yick Bo's creditors' best interests. The exception is the $284,000 payment Worldwide Dreams made to its landlord in June 2011. Whether Gimbel and Feldman objectively or subjectively acted in Yick Bo's and Yick Bo's creditors best interests when they paid Worldwide Dreams' rent, rather than using those funds to pay down Yick Bo's receivable, is a disputed question of material fact.

As to Gimbel and Feldman's other decisions made post-April 2011 to wind down Worldwide Dreams and its subsidiaries, there is no question of material fact that those decisions were objectively and subjectively made in Yick Bo's and Yick Bo's creditors best interests. After the LF USA deal collapsed, Yick Bo essentially ceased incurring trade debt on behalf of Worldwide Dreams; purchase orders associated with 98% of the debt owed to the Hong Kong suppliers had been placed in or before March 2011, when Yick Bo was still solvent. Pl. 56.1

Stmt. ¶ 102. CBC insisted that Worldwide Dreams' and its subsidiaries' assets be sold to satisfy

CBC's debt, and, effective June 2, 2011, CBC reduced its cash advances to Worldwide Dreams.

*Id.* ¶¶ 98-99. As explained above, Worldwide Dreams did not have cash available to pay the

receivable as of March 31, 2011, shortly before the LF USA deal collapsed. Gordon Decl.

Ex. 23. The Factoring Agreement was still operative at that time, so the same concerns about

defaulting under the Agreement remained if Yick Bo had pursued the receivable. It was only in

June 2011, after Worldwide Dreams had sold its business piecemeal, that Worldwide Dreams

satisfied CBC's first priority lien and the Factoring Agreement terminated. Pl. 56.1 Stmt. ¶¶103-

104. Worldwide Dreams then paid Yick Bo approximately $260,000 from the remaining

proceeds, but those proceeds were insufficient to pay all of Yick Bo's debts to its Hong Kong

suppliers. *Id.* ¶¶ 105-106.

Plaintiff argues that Gimbel and Feldman failed to act in Yick Bo's best interests after the

LF USA deal collapsed because they should have sought payment for the entire receivable.

Plaintiff contends that Gimbel and Feldman's reasons for not pursuing the receivable pre-April

2011 vanished after the LF USA deal collapsed—Gimbel and Feldman were no longer trying to

sell the businesses as an ongoing, integrated business, and, by early June, Worldwide Dreams'

obligations to CBC were terminated because CBC had been repaid.[14] Pl. Opp. 11. But, as

explained above, it is indisputable that Worldwide Dreams did not have the funds available to

---

[14]     Plaintiff argues that, after the collapse of the LF USA deal, Gimbel and Feldman did not intend for
Worldwide Dreams to pay Yick Bo. Pl. Opp. 12. In support, Plaintiff points to an email dated May 31, 2011, from
Yick Bo's auditor to Abramson and others stating, "Basically, it is presumed that the receivable from [Worldwide
Dreams] on Yick Bo's books,[sic] will not be paid and will be written off as a bad debt." Galin Decl. Ex. DD (Dkt.
212-4). This email does not support Plaintiff's contention that Gimbel and Feldman breached their fiduciary duty to
Yick Bo because they did not intend to pursue the receivable. On the contrary, it was clear, as explained above, that
Worldwide Dreams did not have the funds to pay Yick Bo in full; the accountant was thus planning for the
inevitable wind-down of the companies. Moreover, this is consistent with Abramson's email to Yick Bo on May 31,
2011, explaining that Worldwide Dreams could not provide a payment schedule that would satisfy the auditors and
approving the release of the qualified opinion on the financial statement, see *supra* note 4. Gordon Reply Deck.
Ex. 72.

pay the entire receivable, and, until the Factoring Agreement was terminated, Gimbel and

Feldman would have run the risk of triggering a default if they had pursued the receivable from

Worldwide Dreams on Yick Bo's behalf. Plaintiff has presented no evidence indicating that if

Gimbel and Feldman had pursued payment of the receivable in June 2011, after the termination

of the Factoring Agreement, Worldwide Dreams would have been able to pay. Indeed,

Worldwide Dreams closed its New York office that same month, and Gimbel and Feldman

received no proceeds from the sale. Pl. 56.1 Stmt. ¶ 107.

Plaintiff maintains that Gimbel and Feldman nevertheless benefited from the proceeds of

the sale because $800,000 was used to pay the California distribution center and $284,000 was

used to pay rent for Worldwide Dreams' office; according to Plaintiff, other corporate entities in

which Gimbel had an ownership interest would have otherwise been responsible for those

payments. *Id.* (*see* response). The payment to the California distribution center was necessary

and in the best interests of Yick Bo and its creditors because the California distribution center

had a priority lien on the warehouse inventory, which was being sold; if the distribution center

had seized the inventory because it had not been paid, the June 2011 asset purchases could not

have taken place, and Yick Bo and its creditors would have recovered even less. Gimbel Reply

Decl. ¶¶ 9-13 (Dkt. 216).

On the other hand, whether the payment to Worldwide Dreams' landlord was in Yick

Bo's and Yick Bo's creditors' best interests is a disputed question of fact. Defendants state that

the corporate entity that executed the lease assigned the lease, including all liability and

obligations, to Worldwide Dreams, but it did not obtain a release. *Id.* ¶¶ 6-7. Defendants argue

that because that entity's only asset was Worldwide Dreams, if Worldwide Dreams had defaulted

on its rent and the landlord had pursued the corporate entity that signed the lease, it would not

have been able to collect a judgment because the corporate entity's only asset was the worthless

Worldwide Dreams. *Id.* ¶¶ 5, 7. While that may all be true, it does not address whether using those funds to pay Worldwide Dream's landlord was in Yick Bo's and Yick Bo's creditors' best interests. Unlike CBC and the California distribution center, which could have enforced their liens and prevented the asset purchase sales leaving Worldwide Dreams and its subsidiaries with nothing, the landlord did not have a lien or a priority interest. Thus, it is a question of fact whether Worldwide Dreams actually paid Yick Bo all that it could have from the asset purchase sale proceeds and whether Gimbel and Feldman, as Yick Bo's directors, should have sought to apply the $284,000 to Yick Bo's receivable instead of to Worldwide Dreams' rent. This $284,000 rent payment is the only portion of Plaintiff's breach of fiduciary duty claim that survives summary judgment.[15]

### B. Other Fiduciary Duties

The other fiduciary duties owed by a director include a duty (1) to act for a proper purpose, (2) to avoid conflicts of interest, and (3) not to make a profit out of one's trust. Ismail Decl. ¶ 7(b) (Dkt. 208). Under Hong Kong law, each of those fiduciary duties must be analyzed separately. *Id.* ¶ 7(c). Defendants contend that Gimbel and Feldman have satisfied all of these duties. Defs. Mem. 15. Plaintiff does not argue that Defendants acted for an improper purpose. Gimbel and Feldman also clearly did not profit as Yick Bo's directors; they lost their entire capital contributions and took no distributions of profits or interest payments on their subordinated loans. Pl. 56.1 Stmt. ¶¶ 107-108. But there is a disputed question of fact whether Gimbel benefited financially from the $284,000 rent payment because the landlord may have

---

[15] The parties also dispute whether Gimbel and Feldman's failure to pursue the total receivable caused the alleged harm to Yick Bo, namely non-payment of the receivable. Defs. Mem. 19-20; Pl. Opp. 16-19. The Court sees no need to address the parties' arguments regarding causation as applied to Gimbel and Feldman's duty to act in Yick Bo's best interest given the Court's rulings above.

otherwise pursued payment from the original lessee in which Gimbel had a an ownership interest (even if the entity had no assets other than Worldwide Dreams).[16]

Plaintiff argues that Gimbel and Feldman had an impermissible conflict of interest because they were directors of both Worldwide Dreams and Yick Bo. Pl. Opp. 9. Gimbel also allegedly had conflicts of interests because: (1) he had an ownership interest in the entity that originally signed Worldwide Dreams' office lease; (2) he had an ownership interest in the entity that owned the California distribution center; and (3) personal pride led him to prioritize Worldwide Dreams over Yick Bo. *Id.* at 9-10.

The parties dispute the legal standard for the duty to avoid conflicts of interest. Specifically, the parties dispute whether Hong Kong law relaxes this duty if the fiduciary discloses the conflict and if the company's articles of association permit a director to also act as a director of another company with which the former company contracts, as Yick Bo's Articles of Association do. *See* Defs. Mem. 21; Pl. Opp. 9-10; Defs. Reply 5; Ismail Report ¶ 84; Donald Rebuttal Report ¶¶ III(D)(1)-(3) (Dkt. 212-2); Ismail Rebuttal Report ¶¶ 15-16 (Dkt. 208-30). The Court need not resolve this legal dispute, however, because even if Gimbel or Feldman had impermissible conflicts of interest, no reasonable jury could conclude that the conflicts of interest—other than Gimbel's ownership interest in the entity that originally signed the Empire State Building office lease—were the "but for" cause of the loss of the receivable. Ismail Decl. ¶ 11 (explaining that causation is established on a "but for" basis).

Plaintiff argues that pursuant to Hong Kong law Defendants have the burden to disprove that the breach of the fiduciary duty caused the loss to the trust estate. Pl. Opp. 16-17. This is

---

[16]     There is no evidence in the record whether the landlord would have had recourse to Gimbel personally. If the lease was non-recourse as to Gimbel personally, it is hard to see how he personally benefited. Because there is no evidence on this point and because all inferences must be drawn in Plaintiff's favor, this is a disputed issue of material fact.

not a correct application of Hong Kong law.  Under Hong Kong law, there are three categories of fiduciary duty breaches for the purpose of damages:

> First, there are breaches leading directly to damage or loss of the trust property; second, there are breaches involving an element of infidelity or disloyalty which engage the conscience of the fiduciary; third, there are breaches involving a lack of appropriate skill or care.  It is implicit in this analysis that breaches of the second kind do not involve loss or damage to the trust property . . . .

*Libertarian Investments Ltd. v. Hall* (2013) 16 HKCFAR 681, Ribiero PJ at § 75 (C.F.A.) (Dkt. 208-15).  Only the first two categories are at issue here; as explained above, Plaintiff has been precluded from bringing a duty of care claim, which is the third category.  "But for" causation applies to a breach of fiduciary duty in the first category.  *Id.* § 79.  As to the second category, Hong Kong law provides that

> in such a case once the plaintiff has shown a loss arising out of a transaction to which the breach was material, the plaintiff is entitled to recover unless the defendant fiduciary, upon whom is the onus, shows that the loss or damage would have occurred in any event, ie[sic] without any breach on the fiduciary's part.

*Id.* § 82.  This is the language on which Plaintiff relies to argue that it is Defendants' burden to disprove loss causation.  But Plaintiff's fiduciary duty claim falls into the first category of breach, not the second.  Plaintiff alleges that Gimbel and Feldman's breach of fiduciary duty led directly to a loss of Yick Bo's property because "[t]heir breach of fiduciary duty to Yick Bo caused Yick Bo to lose it assets without any compensation or repayment from [Worldwide Dreams]."  Am. Compl. ¶ 68 (Dkt. 66).  Specifically, the loss to Yick Bo was the receivable owed by Worldwide Dreams.  *See id.* ¶ 67.  The second category of breach, which includes conduct that engages "the conscience of the fiduciary," explicitly excludes breaches that lead directly to loss or damage to the trust property.  *Libertarian Investments Ltd. v. Hall* (2013) 16 HKCFAR 681, Ribiero PJ at § 75.  Accordingly, the "but for" causation standard applies here; Defendants do not have the burden to disprove causation, as Plaintiff argues.

Plaintiff has not presented evidence to create a disputed question of fact as to whether Gimbel and Feldman's alleged impermissible conflict of interest as directors of both Yick Bo and Worldwide Dreams was the "but for" cause of the loss of the receivable. The accounting information and testimony in the record make clear that Worldwide Dreams did not have enough money to pay Yick Bo fully, even if Gimbel and Feldman had pursued the receivable. The Court has already rejected Plaintiff's arguments that the Court should not rely on the unaudited financial statements submitted by Defendants, and, aside from complaining that the financial statements are unaudited, Plaintiff has submitted no contradictory evidence of Worldwide Dreams' financial situation. Even after the asset purchase transactions in June 2011, Plaintiff has not shown that Gimbel and Feldman's alleged impermissible conflict of interest as directors of Worldwide Dreams and Yick Bo was the "but for" cause of Yick Bo's loss of the receivable. On the contrary, the evidence shows that CBC and the California distribution center had a first priority lien on the assets sold and that Worldwide Dreams was thus required to pay CBC and the California distribution center before making other payments. For this same reason, Plaintiff has presented no evidence to create a disputed question of fact as to whether Gimbel's alleged impermissible conflict of interest as a part-owner of the California distribution center was the "but for" cause of the loss to Yick Bo.

Plaintiff has also presented insufficient evidence to create a disputed question of fact as to whether Gimbel's personal pride was an impermissible conflict of interest that was the "but for" cause of Yick Bo's loss of the receivable. In support, Plaintiff points only to Gimbel's deposition testimony:

Q: Why didn't you put [Worldwide Dreams] into bankruptcy?
. . .
A: Because after 55 years of working my ass off and having a wonderful reputation in this industry, I have never owed anybody. . . . And I, certainly at 85 years old, do not intend to have my name connected with any bankruptcy.

Gordon Decl. Ex. 1 Tr. 123:2-10 (Dkt. 202-1).[17]  This testimony alone does not suffice to create

a disputed question of fact as to whether Gimbel's personal pride was the "but for" cause of Yick

Bo's loss of the Worldwide Dreams receivable.  As explained numerous times, Worldwide

Dreams' inability to pay and CBC's and the California distribution center's priority liens were

intervening causes of Yick Bo's loss of the receivable.[18]

There is, however, a disputed question of fact as to whether Gimbel's ownership interest

in the entity that originally signed Worldwide Dreams' office lease was an impermissible

conflict of interest that was the "but for" cause of the loss of $284,000 owed to Yick Bo.  As

already discussed, it is unclear why Worldwide Dreams paid its office rent before paying Yick

Bo as there is no evidence that the landlord had any kind of lien on Worldwide Dreams' assets.

Defendants have presented no evidence showing why it was necessary for Worldwide Dreams to

pay the rent instead of using those funds to pay down Yick Bo's receivable.  A reasonable jury

could find that Gimbel used the $284,000 to pay rent rather than using it to pay down Yick Bo's

receivable because he had an ownership interest in the original lessee that had not procured a

release, leaving his company—or possibly even him—potentially liable for the rent.[19]

---

[17]    Plaintiff implicitly suggests by pointing to this testimony that Yick Bo would have fared better had
Worldwide Dreams filed for bankruptcy.  Inasmuch as Yick Bo was an unsecured creditor of its parent corporation,
it is not obvious why a bankruptcy would have been beneficial to Yick Bo.

[18]    Gimbel also testified in response to the follow up question, "So you were looking out for yourself?" that he
and his partners were looking out for their employees, that they lost their entire investment in the company,  and that
he "never took anybody else's money."  Gordon Decl. Ex. 1 Tr. 123:14-25.

[19]    Defendants argue that under Hong Kong law, the alleged conflicts of interest are not impermissible because
they were disclosed and because Yick Bo's Articles of Association permitted Yick Bo's directors to act as a director
of another company with which Yick Bo transacts, such as Worldwide Dreams.  Defs. Mem. 21; Defs. Reply 5.
Plaintiff disputes that this is true under Hong Kong law, but the Court finds no need to resolve this legal dispute, as
explained above, given its causation analysis.  But, the Court notes that, even if Defendants are correct regarding
Hong Kong law, Defendants have presented insufficient evidence that this conflict regarding the office lease was
disclosed to Yick Bo.  Defendants have presented evidence that Gimbel's ownership interest in the original lessee
entity was disclosed in Worldwide Dreams' amended LLC agreement, *see* Defs Reply 5-6 n.9 (citing Gordon Decl.
Ex. 3 (Dkt. 202-3)), but Defendants have presented no evidence that Chu, Yick Bo's independent director, was
aware that entity was the original lessee or that it had not obtained a release, which is the reason that there is a

Summary judgment is therefore denied as to Plaintiff's breach of fiduciary duty claim as it relates to the $284,000 paid in rent. As to the balance of Plaintiff's breach of fiduciary duty claim, Defendants' motion for summary judgment is granted.[20]

## C. Reimbursement Claim

In its reimbursement claim, Plaintiff alleges that Worldwide Dreams owes Yick Bo reimbursement for (1) the purchases it made from Hong Kong suppliers as Worldwide Dreams' agent and (2) commissions Yick Bo earned when making those purchases. Am. Compl. ¶¶ 73, 74. The amount claimed in reimbursement is the same amount claimed for breach of fiduciary duty—$14.68 million, which is the amount allegedly due pursuant to the receivable. Of that $14.68 million, $298,297.02 represents unpaid commissions. Pl. 56.1 Stmt. ¶ 135.

The parties do not dispute that the Agency Agreement provided that Worldwide Dreams would pay Yick Bo commission for the purchases it made on behalf of Worldwide Dreams. *Id.* ¶ 25; Gordon Decl. Ex. 11 ¶ 3. Worldwide Dreams makes no arguments and presents no evidence to support its motion for summary judgment as to Plaintiff's claim for commissions. Accordingly, summary judgment is denied as to Plaintiff's claim for commissions worth $298,297.02.[21] That leaves $14.38 million at issue pursuant to Plaintiff's reimbursement claim.

The parties also do not dispute that the Agency Agreement did not explicitly require Worldwide Dreams to reimburse Yick Bo for the purchases it made on behalf of Yick Bo. Pl.

---

conflict. If the original lessee had obtained a release, there would be no conflict because the landlord could not have pursued the original lessee for the rent.

[20]     Plaintiff is not entitled to punitive damages even if it ultimately prevails on its breach of fiduciary duty claim regarding the $284,000 paid in rent. Under Hong Kong law, the defendant's breach must be "outrageous" for punitive damages to be awarded. Ismail Report ¶¶ 110-115. No reasonable jury would find that Gimbel and Feldman's failure to pursue on behalf of Yick Bo the $284,000 paid in rent was outrageous conduct.

[21]     Plaintiff styles this as a claim for "reimbursement," but Plaintiff's claim for unpaid commissions is really a breach of contract claim.

56.1 Stmt. ¶ 26; *see generally* Gordon Decl. Ex. 11.  Instead, Plaintiff claims Worldwide Dreams

must reimburse Yick Bo because Yick Bo was acting as Worldwide Dreams' agent.  Pl. Opp. 20.

Worldwide Dreams argues that, pursuant to Hong Kong law, an agent is not liable for debts

incurred on behalf of a disclosed principal when the agent expressly disclaims any intent to

assume liability on behalf of the principal.  Defs. Mem. 24 (citing *Wing Fu Trading Co. v.*

*Sweigle Co. Ltd.* (unreported, 16 March 1994; A 2511/1990) (H.C.) (Gordon Decl. Ex. 70 (Dkt.

202-70)); *Toymax (HK) Ltd. v. Redsmith Int'l* (1994) 1 HKC 714 (H.C.) (Gordon Decl. Ex. 71

(Dkt. 202-71))).  Because Yick Bo did just that, Worldwide Dreams argues, Yick Bo was not

required to pay the sums for which it is now seeking reimbursement.  *See id.*

Whether Yick Bo expressly disclaimed any intent to assume liability on behalf of

Worldwide Dreams when making purchases is a disputed question of fact.  Although the

purchase orders Yick Bo provided to the Hong Kong suppliers identified Yick Bo as an agent of

Worldwide Dreams, *see* Pl. 56.1 Stmt. ¶ 27; *see, e.g.*, Gordon Decl. Ex. 12, the invoices prepared

by the suppliers stated that the invoiced amounts were "to be paid by Yick Bo Trading Ltd,"[22]

s*ee, e.g.*, Galin Decl. Ex. H.  Moreover, in affidavits submitted in the fall and winter of 2011 in

lawsuits brought by suppliers against Worldwide Dreams, Worldwide Dreams' controller

averred that Yick Bo had "assumed sole payment responsibility" for the goods at issue.  *See*

Galin Decl. Ex. L ¶ 1.  This evidence suffices to create a disputed question of fact.

Nevertheless, there is no question of fact as to a portion of the $14.38 million sought by

Plaintiff in its reimbursement claim.  In February 2012, Worldwide Dreams settled debts owed

by Yick Bo to some suppliers for approximately $1.3 million.  Pl. 56.1 Stmt. ¶ 115.  Although

---

[22]    Many of the invoices also provided the following: "Sold To: Worldwide Dreams LLC."  *See* Galin Decl. Ex. H.

the parties dispute whether Worldwide Dreams had the legal authority to settle Yick Bo's debts once Yick Bo was in liquidation, Plaintiff admits that, as of July 12, 2013, Yick Bo owed only approximately $2.5 million to third party creditors (other than WWDI). Pl. 56.1 Stmt. ¶ 122. That amount is net of the debts that were settled by Worldwide Dreams. Accordingly, the $14.38 million reimbursement claim must be reduced by the $1.3 million paid in settlement.[23] Yick Bo is not entitled to a windfall by receiving more in reimbursement from Worldwide Dreams than the amount it owes to third party creditors for purchases it made as agent for Worldwide Dreams.

The parties dispute whether the Court can exclude $6.2 million from the reimbursement claim because it reflects an intercompany debt owed by Yick Bo to WWDI. Plaintiff argues that this setoff is impermissible under Hong Kong law, whereas Worldwide Dreams argues it is permissible. Defs. Mem. 23; Pl. Opp. 21. Plaintiff agrees with Worldwide Dreams that before Yick Bo went into liquidation, Worldwide Dreams could have used "intra-group book entries" to extinguish Yick Bo's $6.2 million debt to WWDI and that the remaining balance in Worldwide Dreams' receivable owed to Yick Bo could have been paid through book entries and then immediately returned to Worldwide Dreams via dividend. Pl. 56.1 Stmt. ¶ 60; Tan Report ¶ 31(a) (Dkt. 207-1). Although book entries could have erased aspects of the intercompany debts, those book entries never occurred. Unfortunately for Worldwide Dreams, setoff is no longer an available option because Yick Bo is in liquidation. Worldwide Dreams' own expert acknowledges explicitly that setoff was only valid prior to liquidation. Tan Report ¶ 31(a) ("In practice, on assignment (*prior to liquidation*), this intercompany payable (US$6.2 million from Yick Bo to WWDI) would be set-off against the inter-company receivable (US$14.68 million

---

[23] The exact amount paid in settlement was $1,292,789. Pl. 56.1 Stmt. ¶¶ 117, 120.

from WWD to Yick Bo) . . . .") (emphasis added); *see also* Minju Kim Decl. ¶ 18 (Dkt. 212-2) ("In the case of insolvency set-off, the requirement that the demands be held in the same capacity (or right, or interest) means that each of the parties, who is liable to the other, must be the beneficial owner of the cross-claim against the other." (citation omitted)). WWDI and Yick Bo's Hong Kong suppliers are competing creditors; because there is no evidence that WWDI is a secured creditor of Yick Bo, there is no basis to satisfy Yick Bo's debt to WWDI via setoff before satisfying Yick Bo's debt to its Hong Kong suppliers. Accordingly, the Court does not setoff the $6.2 million to reduce Plaintiff's reimbursement claim.

Subtracting from the $14.38 million reimbursement claim the $2.5 million indisputably owed to third party creditors in liquidation and the $1.3 million that was previously paid to settle claims from third party creditors still leaves approximately $10.58 million of the reimbursement claim unaccounted for. The parties have presented no evidence from which the Court can determine whether there is a question of fact whether Yick Bo is entitled to reimbursement for that $10.58 million as Worldwide Dreams' agent. Because at summary judgment this Court must construe the facts in the light most favorable to Plaintiff and resolve all ambiguities against Defendant, the Court cannot determine, as a matter of law, that Worldwide Dreams is not liable for the $10.58 million. If Yick Bo did not incur that portion of the receivable through actions it took as Worldwide Dreams' agent (e.g., that amount represents claimed reimbursement for maintenance or personnel costs), then that portion of the receivable would be excluded as a matter of law from Plaintiff's reimbursement claim, which only entitles Plaintiff to reimbursement for costs incurred by Yick Bo as Worldwide Dreams' agent.[24]

---

[24] Maintenance and personnel costs are not costs incurred due to an agency relationship. For example, if Yick Bo had been Worldwide Dreams' buying agent but not its wholly owned subsidiary, it would not have been entitled to recover from Worldwide Dreams its maintenance and personnel costs because those costs would not have been incurred on account of the agency relationship.

In summary, Worldwide Dreams' motion for summary judgment as to Plaintiff's reimbursement claim is denied as to the claim for $298,297.02 in unpaid commissions and as to $13.08 million[25] in potentially reimbursable costs and is granted as to the balance of the claim ($1,292,789).

## CONCLUSION

For the foregoing reasons, Gimbel and Feldman's motion for summary judgment is GRANTED in part and DENIED in part as to Plaintiff's breach of fiduciary duty claim; it is DENIED only as to the $284,000 paid by Worldwide Dreams in June 2011 to its landlord. Worldwide Dreams' motion for summary judgment is GRANTED in part and DENIED in part as to Plaintiff's reimbursement claim; it is DENIED as to $298,297.02 in commissions for breach of contract and as to $13.08 million for reimbursement as Worldwide Dreams' agent. The Clerk of the Court is directed to terminate docket entry 200.

The parties must appear for a conference on September 15, 2017, at 10:00 a.m. in Courtroom 443 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, NY. On or before September 7, 2017, the parties must submit a joint letter proposing a trial schedule and informing the Court whether they would like a referral to Magistrate Judge Pitman for a settlement conference. At the conference, the Court will set a trial schedule.

**SO ORDERED.**

**Date:  September 1, 2017                     VALERIE CAPRONI**
**New York, NY                                United States District Judge**

---

Moreover, the time for claimants to come forward in the Hong Kong liquidation has not closed. S*ee* Gordon Decl. Ex. 62 Tr. 43-44 (Dkt. 202-62). There may, therefore, be debts owed to other third party creditors from whom Yick Bo made purchases as Worldwide Dreams' agent that would account for at least a portion of the unaccounted for $10.58 of the receivable.

[25]        $2.5 million owed to Hong Kong suppliers + $10.58 million unaccounted for = $13.08 million.